## APPEALS OF EMIL STERN AND JULES STERN.

Docket Nos. 2186, 2187.    Decided October 13, 1926.

1. In determining whether the cost of securities of an American citizen seized by the German Alien Property Custodian may be deducted, it is necessary to distinguish between a loss sustained and a debt ascertained to be worthless and charged off.

2. The cost of bonds seized by the German Alien Property Custodian can not be deducted as debts ascertained to be worthless in the absence of any showing of the financial condition of the debtor.

3. Where bonds of an American citizen were seized by the German Alien Property Custodian in 1918, the citizen lost all right, title, and interest in said bonds; his only remedy being to request his Government to assume his claim as its own and attempt to secure redress from the German Government. In such circumstances, *held*, that a deductible loss was sustained in 1918.

*Richard E. Dwight, Esq., Oscar R. Ewing, Esq.,* and *J. R. Little, Esq.,* for the petitioners.
*Percy S. Crewe, Esq.,* for the Commissioner.

The taxpayers appeal from the determination by the Commissioner of deficiencies in income tax for 1918 and 1919 as follows:

|  | 1918. | 1919. |
|---|---|---|
| Emil Stern | $36,333.20 | $162,349.61 |
| Jules Stern | 27,311.99 | 154,306.99 |

The deficiencies are due in part to the refusal of the Commissioner to allow certain deductions for alleged losses or bad debts to a partnership composed of the taxpayers, and the appeals have been consolidated.

### FINDINGS OF FACT.

The taxpayers in these appeals are, and during all the times mentioned herein were, American citizens and equal copartners in the firm of Stern & Stern, 79 Fifth Avenue, New York City. This firm has been engaged in business since 1888 as importers and converters of silk fabrics, cotton goods, etc.

Prior to the outbreak of the World War in 1914, the taxpayers regularly purchased large quantities of goods in Germany. To finance these purchases, the taxpayers had funds on deposit with the Prussian State Bank of Berlin, as well as securities having a value of several hundred thousand marks. Payments for goods so purchased were made by drafts drawn on the Prussian State Bank, and, if the firm did not have on deposit with said bank funds sufficient to pay such drafts, the bank nevertheless paid them, holding

the securities as collateral for such overdrafts.  Such securities were owned in equal shares by the taxpayers.

On March 25, 1918, all of the securities so held by the Prussian State Bank and the aforesaid bank deposit were seized by the German Custodian of Alien Property.  The taxpayers had no knowledge of such seizure until the early part of 1919.

After the Armistice, Emil Stern, in New York, wrote to his brother, Jules Stern, in Paris, to sell both their French and German securities.  Jules Stern got in touch with another brother in Berlin, a director of the Prussian State Bank, but was unable to secure possession of the seized property.

In April, 1919, Judge Max Stern, a brother of these taxpayers and President of the highest Court of Appeals in Berlin, called upon the German Custodian of Alien Property at the request of these taxpayers in order to find out what had become of their securities.  Judge Stern ascertained that said securities had been seized by such custodian.  This was the first definite knowledge the taxpayers had that their securities and bank deposit with the Prussian State Bank had been seized.

In the early part of 1919, Jules Stern had written the American Embassy in Paris and Emil Stern had written the State Department in Washington, advising both that the taxpayers had property enumerated in said communications within Germany, which taxpayers feared had been seized by the German Custodian.  These communications were acknowledged by letters in which the taxpayers were informed that " in receiving it and making it of record no assurance can be given that it will be deemed proper to take any action in the matter in your behalf."

In October, 1919, attorneys for the taxpayer wrote to the Prussian State Bank on behalf of these taxpayers and asked the present status of the taxpayers' account with said bank and whether they could sell the securities as they wished.  The bank replied that it could not give any information, inasmuch as the Alien Property Custodian had refused to grant the required permission.

In the fall of 1919, the taxpayers' firm sent buyers to Germany and began again to purchase goods.  In connection with the financing of these purchases, the taxpayers requested the Prussian State Bank again to pay drafts of taxpayers against the deposit or on the security of the securities so seized by the German Custodian, but the bank refused to honor such drafts or to lend anything on such security.  Taxpayers purchased marks with other funds to pay for such purchases.

The taxpayers were advised at the end of 1919 that they had no title under German law to the securities and deposit in question.

by reason of their seizure by the German Custodian of Alien Property. At the end of 1919 the taxpayers had no expectation that the Government of the United States might secure the return of this property to them.

Under the German law, after the property of American citizens had been seized they had no title in such property. The legal title to such property vested in the German Custodian and the American citizens whose property had been seized could not sell it, as it was incapable of being assigned, transferred or mortgaged, nor could they transfer any interest that they might have in it.

There were no means under the German law by which these taxpayers could recover their property. At the end of 1919 these taxpayers did not have any claim against Germany which could be enforced under any treaty or under any existing principle of international law, and there was no tribunal in existence wherein these taxpayers might have proven and enforced their claims.

At the end of 1919 the Government of the United States had not adopted a policy with respect to the collection of claims against Germany. At that time the State Department uniformly advised American citizens desiring to know whether their property seized by the German Custodian would ever be returned, that the question was so far in the future that it depended upon considerations which could not be foretold at that time.

At the end of 1919 the United States and Germany were still technically at war and it could not be foreseen at that time when peace would be made between them. The Senate had rejected the Treaty of Versailles and there was a deadlock between the President and the Senate which had engendered such bitterness that no one could then say when a treaty of peace would be made. It was impossible at that time to know what provision such treaty, when made, would contain with respect to property of American citizens which had been seized by the German Custodian.

On June 30, 1917, the securities on deposit with the Prussian State Bank included bonds of the German Government, of German municipalities and German railway and commercial companies; stocks in German companies and bonds of the Japanese, Chinese and Moroccan Governments. The bonds of the German Government, municipalities and companies so held on that date had cost the taxpayers 955,719.75 marks. The March 1, 1913, value of such bonds as were acquired prior to that date, plus the cost of those acquired thereafter, was 866,848.60 marks. As to each of such securities, the March 1, 1913, value was less than cost. The stocks in German companies so held on June 30, 1917, had cost taxpayers 95,152.50 marks, and the March 1, 1913, value was 87,702 marks. On the same

date there was on deposit in that bank to the credit of the partnership 332,392.25 marks. All of such securities and credit had been acquired by taxpayers at the normal rate of exchange of the mark, namely, 23.80 cents per mark.

As interest coupons were clipped and as bonds were redeemed or paid, the proceeds were deposited in the account, both before and after the seizure of such account by the German Alien Property Custodian. The taxpayers had no knowledge of this on December 31, 1919, or prior thereto. The seizure by the German Alien Property Custodian included all of such bonds and stocks and the cash balance on deposit, including the proceeds of any of such bonds paid or redeemed between June 30, 1917, and the date of seizure.

In December, 1919, the taxpayers charged off the cost of such bonds, stocks and bank balance on their books, excepting the bonds of the Japanese, Chinese and Moroccan Governments.

No part of the loss claimed by the taxpayers as a result of the seizures was compensated for by insurance.

In 1921 the Alien Property Custodian returned to the taxpayers the property which had been seized or the proceeds of such part thereof as had been disposed of by him. In preparing their income-tax return for that year the taxpayers included as income the value of the securities and marks then received.

In computing the deficiencies the Commissioner refused to allow the taxpayers any deduction, either in 1918 or 1919, for debts ascertained to be worthless or for losses sustained.

OPINION.

PHILLIPS: At the time the United States entered the World War in 1917 the petitioners had certain bonds, stock and bank deposits in Germany, which were seized in 1918 by the German Alien Property Custodian. They seek to deduct as debts ascertained to be worthless and charged off in 1919, the March 1, 1913, value (which was less than cost) of the German Government, municipal and corporation bonds, and the cost to them of the bank deposit. The evidence establishes that such bonds are, under the German law as under our laws, evidences of indebtedness and therefore the subject of such a deduction under proper circumstances. As to the stocks in German companies, it is conceded that these do not constitute an indebtedness, and deduction for a loss is claimed in 1918, the year of the seizure.

The Revenue Act of 1918 provides for the deduction of both debts ascertained to be worthless and losses sustained. If a debt becomes worthless, it would seem that a loss has been sustained. Debts,

however, are deductible in the year in which they are ascertained to be worthless and charged off, which may be other than the year in which they in fact became worthless. Since it can not be assumed that a double deduction was intended, it would appear that, if a debt became worthless in one year, but was not ascertained by the taxpayer to be worthless until the following year, deductions could not be taken for a loss in the first year and for a bad debt in the second. Furthermore, a loss may be sustained upon account of an indebtedness without any ascertainment of worthlessness, as, for example, the embezzlement of negotiable securities. In that case, a loss may be sustained in the year of the embezzlement, although there has been no ascertainment that the debt itself is worthless.

It becomes necessary, therefore, in every case to distinguish between a loss sustained and a debt ascertained to be worthless. In the present instance it appears to us that there has been no proof that any of the debts in controversy were worthless. The fact, so far as there is any proof, is that the debtors were solvent; indeed, some of the bonds were redeemed and the proceeds deposited in the seized account during 1918 and 1919. The claim for the deduction is based, not upon the worthlessness of the bonds or of the bank deposit, but rather upon the seizure thereof by the German Government. The fact is that, while uncollectible by taxpayers, the debts did have a value and were collectible by the new owner. It is our opinion that the seizure and continued holding of these bonds by authority of the enemy government does not constitute the basis for a deduction upon the ground that the debts were ascertained to be worthless, and that, if any deduction is allowable, it is upon the basis of a loss sustained by reason of the seizure.

We come then to consider whether any deductible loss was sustained in 1918, when the property was taken over by the German Alien Property Custodian by decree of the Imperial German Government. The undisputed evidence is to the effect that under such decree possession, title, and all interest in the seized property were taken from the taxpayers and vested in the Custodian, but that such decree did not provide what ultimate disposition should be made of the property. The Custodian, however, was an agent of the German Government which possessed the necessary power to enforce its decree. Since no provision was made for the ultimate return of the property or for compensation, the substance of the situation was that possession of and title to the property was taken from the taxpayers and vested in the German Government. All rights of the taxpayers in the property ceased, and it was only in the event that Germany should later, by treaty or otherwise, provide for its

return or for compensation that any rights would arise in favor of the taxpayers.

Although the taxpayers no longer had any interest or title in the property, under principles of international law, which the German Government might or might not recognize, a claim arose against the German Government upon the part of the United States on behalf of the taxpayers, which the United States might or might not prosecute as it saw fit and by such means as were available.

One nation treats with the citizens of another only through their government. A sovereign cannot be sued in his own courts without his consent. His own dignity, as well as the dignity of the nation he represents, prevents his appearance to answer a suit against him in the courts of another sovereignty, except in performance of his obligations, by treaty or otherwise, voluntarily assumed. Hence, a citizen of one nation wronged by the conduct of another nation, must seek redress through his own government. His sovereign must assume the responsibility of presenting his claim, or it need not be considered. If this responsibility is assumed, the claim may be prosecuted as one nation proceeds against another, not by suit in the courts, as of right, but by diplomacy, or, if need be, by war. It rests with the sovereign against whom the demand is made to determine for himself what he will do in respect to it. He may pay or reject it; he may submit to arbitration, open his own courts to suit, or consent to be tried in the courts of another nation. All depends upon himself. (*United States* v. *Diekelman*, 92 U. S. 520).

Many instances of treaties in which a government has surrendered the claims of its nationals might be cited, but two recent examples will suffice. In the treaty negotiated with Spain in 1899, following the Spanish-American War, it was provided:

The United States and Spain mutually relinquish all claims for indemnity, national and individual, of every kind, of either Government, or of its citizens or subjects, against the other Government, that may have arisen since the beginning of the late insurrection in Cuba and prior to the exchange of ratifications of the present treaty, including all claims for indemnity for the cost of the war.

The United States will adjudicate and settle the claims of its citizens against Spain relinquished in this article. (Art. VII, 30 Stat. 1754.)

In the Treaty of Versailles, negotiated June 28, 1919, which formed the basis of peace between Germany and the European Allies, it was provided in Part X, section IV, that the property of German nationals within the territory of the Allies should be retained and liquidated by such Allied power and that the proceeds might be charged with the amounts due the nationals of such Allied power arising out of their property in German territory or debts due them by German nationals. Sen. Doc. No. 49, 66th Cong., 1st Sess. Under the treaty of peace between the United States and Germany a similar power with respect to the property of German nationals within the territory of the United States was reserved to this country.

It would accordingly appear that, after the property was taken by the Custodian, the taxpayers were entirely devested of their

property. All that they had was the hope that the treaty of peace would provide for the return of such property, or its value, or, if not, that the United States would compensate its nationals for seized property which Germany might be permitted to retain under such treaty. Any claim which existed, however, was a claim upon the United States, either to secure a return of the property by Germany or, if it allowed confiscation as part of the terms of the treaty, to compensate those whose property was lost.

We are accordingly of the opinion that the taxpayers sustained a loss in 1918 which they are entitled to deduct in their returns for that year.

> *Orders of redetermination will be entered accordingly on 15 days' notice, under Rule 50.*

MARQUETTE did not participate.