HALLIBURTON CO., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 9797-86.        Filed December 26, 1989.

*David T. Harvin, Donald F. Wood, David Gerger,* and *George M. Gerachis,* for the petitioner.

*Cynthia J. Mattson* and *Eli J. Dicker,* for the respondent.

TANNENWALD, *Judge:* Respondent determined deficiencies in petitioner's Federal income taxes of $27,953, $11,126,409, and $20,907,748 for the taxable years 1977, 1978, and 1979, respectively. After concessions, the issues for decision are whether petitioner is entitled to deduct losses in 1979

pursuant to section 165[1] for the expropriation of stock and debt by the Iranian government in 1979, or alternatively as worthless securities and debt under sections 165(g) and 166(a), respectively, both of which issues turn essentially upon the existence of a reasonable prospect of recovery as of December 31, 1979. To the extent that we find such losses deductible, the parties agree that the loss in respect of the stock is a long-term capital loss, and the loss in respect of the debt is an ordinary loss.

This case arises against the backdrop of the political, economic, religious, and cultural chaos stemming from the Iranian Revolution and the American hostage crisis that captured the attention of this country from November 4, 1979, to January 20, 1981. In this connection, we note that, if set forth in detail, the chronology of events affecting the issue of reasonable prospect of recovery in respect of the expropriation losses would be unduly lengthy. Such being the case and in view of the fact that there is no disagreement between the parties that the events occurred (as distinguished from the effect to be given to them), we have decided simply to set forth a chronology in terms sufficient to provide the necessary background to our decision. We also note that, in order to avoid repetition, we have reserved some of the facts for inclusion in our opinion.

## FINDINGS OF FACT

Some of the facts are stipulated and are so found.

Petitioner is a publicly held oil field service corporation with its principal place of business in Dallas, Texas. It maintained its books and records and filed its tax returns on a calendar year basis using the accrual method of accounting. It filed a timely Federal income tax return for the taxable year 1979 with the Internal Revenue Service Center, Austin, Texas, on July 21, 1980.

In April 1977, petitioner bought stock in Doreen/IMCO, an Iranian private joint stock company organized under the laws of Iran. From this time through April 1979, petitioner also made a series of loans to Doreen/IMCO. In May 1977, Doreen/IMCO began construction of a barite processing and

---

[1] All statutory references are to the Internal Revenue Code as amended and in effect for the year in issue.

grinding plant in Kashan, Iran. Barite is an ingredient of drilling mud used in drilling oil and gas wells. Doreen/IMCO completed construction and began operating the plant in June 1978.

During 1978 and 1979, Ayatollah Ruhollah Khomeini (Khomeini) led an Islamic revolution in Iran ousting Shah Mohammad Reza Pahlavi (Shah), who had ruled Iran as its monarch since 1953, from political power. The Shah fled Iran on January 16, 1979, and Khomeini returned to Iran from exile in France on January 31, 1979. After the new government of Prime Minister Shahpur Bakhtiar failed, Khomeini set up a provisional Islamic government on February 11, 1979, headed by Prime Minister Mehdi Bazargan. The Islamic Republic of Iran was proclaimed on April 1, 1979.

Khomeini's revolution espoused fundamental Islamic religious tenets, was violently anti-American, and attempted to rid Iran of Western influence by seizing control of American companies doing business in Iran. In the fall of 1978, revolutionary unrest and civil disturbances first began to affect the operation of the Doreen/IMCO mine. In November and December 1978, Doreen/IMCO's offices and plant were damaged during a series of attacks perpetrated by plant workers sympathetic to the revolution. Due to revolutionary activity, Doreen/IMCO's American manager fled Iran in November 1978 and operated from Bahrain until February 6, 1979, when he returned to the United States. Doreen/IMCO shut down its plant and laid off its workers on January 20, 1979, due to the loss of key management expertise, the lack of money and imported parts to repair damage caused by the attacks, and the collapse of the Iranian barite market caused by the revolution.

On February 14, 1979, Marxist guerrillas attacked the U.S. Embassy in Tehran holding more than 100 hostages, including the American ambassador, for 2 hours until dispersed by Khomeini's forces. Thereafter, the Embassy strongly recommended that all Americans leave the country. One week later, Doreen/IMCO's former Iranian employees rioted and took over the Kashan plant. The workers demanded that the plant be reopened and that they be paid back wages. In response to these employee demands, in

April 1979, the government of Iran's Ministry of Industries and Mines, through its Committee of Industrial Protection and Prevention of Factories Stoppage in the Country, imposed liability for severance pay on Doreen/IMCO and borrowed approximately $570,000 from Bank Melli Iran to begin provisional administration of Doreen/IMCO. The Iranian government demanded that Doreen/IMCO meet two conditions for return of the plant: repay the Bank Melli loan plus 6-percent interest and establish that plant operations could be financially self-supporting. Doreen/IMCO was unable to meet those demands.

In May 1979, the Iranian government took official possession of Doreen/IMCO's Kashan facilities pursuant to the Law of Protection of Industries and Prevention of Stoppage of Factories. During 1979, Iran also nationalized foreign insurance companies, foreign banks, and other foreign industries. Although its facilities were nationalized, petitioner designated Iranian representatives to attend the Doreen/IMCO shareholders' and board of directors' meetings held in Tehran in September 1979. Petitioner's representatives also attended Doreen/IMCO's annual meetings in 1980 in London and in 1981 in California.

Despite the attack on the American Embassy in February 1979 and the attacks on American business interests throughout Iran, the United States attempted to maintain diplomatic and economic relations with the revolutionary government in Iran. Such relations were, however, characterized by constant tension which increased dramatically after the Shah arrived in New York on October 22, 1979, from exile in Mexico to undergo medical treatment. His arrival in the United States provoked a harsh wave of anti-American demonstrations in Iran culminating in a group of militants, supported by Khomeini, seizing the U.S. Embassy in Tehran on November 4, 1979, taking 65 American hostages, and demanding that the United States extradite the Shah. Thereafter, the U.S. State Department again advised all Americans in Iran to leave the country.

Subsequently, Iran refused to release the hostages until the United States: (1) Returned the Shah's assets; (2) ceased interfering in Iranian affairs; and (3) apologized for past U.S. crimes against Iran. The United States responded to

the demands by letting Iran know that: (1) American courts were open to Iran to pursue the Shah's wealth; (2) the United States would not interfere internally in Iran; but (3) the United States would not apologize for its so-called crimes.

At the time of the hostage taking, the Iranian political leadership was in disarray. A political power struggle existed between the moderates and the radical clergy, with Khomeini calling for a purge of those not in the mainstream of the Islamic Revolution. A few days after the Embassy was seized, Prime Minister Bazargan and his cabinet resigned, and Khomeini gave political power to the Revolutionary Council to manage a transition government until new elections could be held. At about the same time, Khomeini refused to allow American emissaries, former Attorney General Ramsey Clark and William Miller, former Staff Director of the Senate Committee on Intelligence, to enter Iran to discuss release of the hostages. On November 7, 1979, he also forbade Iranian officials to have discussions with any American representatives, a barrier to direct communications with Iran that was maintained throughout the crisis.

In an attempt to pressure the Iranian government to release the hostages, President Carter ordered a prohibition on oil imports from Iran on November 12, 1979. On November 14, 1979, when Iran indicated its intention to withdraw its deposits from U.S. financial institutions, President Carter, by executive order, froze all property and property interests of the Government of Iran, its instrumentalities and controlled entities, and the Central Bank of Iran in U.S. banks and their foreign branches. Iran closed its airspace to U.S. aircraft and the United States halted shipment of all military equipment to Iran and virtually ceased all trade with Iran on November 14, 1979. The executive order implementing the freeze provided:

### BLOCKING IRANIAN GOVERNMENT PROPERTY

Pursuant to the authority vested in me as President by the Constitution and laws of the United States including the International Emergency Economic Powers Act, 50 U.S.C.A. sec. 1701 *et seq.*, the National Emergencies Act, 50 U.S.C. sec. 1601 *et seq.*, and 3 U.S.C. sec. 301,

I, Jimmy Carter, President of the United States, find that the situation in Iran constitutes an unusual and extraordinary threat to the national security, foreign policy and economy of the United States and hereby declare a national emergency to deal with that threat.

I hereby order blocked all property and interests in property of the Government of Iran, its instrumentalities and controlled entities and the Central Bank of Iran which are or become subject to the jurisdiction of the United States or which are in or come within the possession or control of persons subject to the jurisdiction of the United States.

The Secretary of the Treasury is authorized to employ all powers granted to me by the International Emergency Economic Powers Act to carry out the provisions of this order.

This order is effective immediately and shall be transmitted to the Congress and published in the *Federal Register.*

/s/ Jimmy Carter

[Executive Order 12170 of Nov. 14, 1979, 44 Fed. Reg. 65729 (Nov. 15, 1979).]

### The White House announcement of the President's action stated:

The President has today acted to block all official Iranian assets in the United States, including deposits in United States banks and their foreign branches and subsidiaries. This order is in response to reports that the Government of Iran is about to withdraw its funds. The purpose of this order is to ensure that claims on Iran by the United States and its citizens are provided for in an orderly manner.

The order does not affect accounts of persons other than the Government of Iran, the Central Bank of Iran, and other controlled entities. The precise amounts involved cannot be ascertained at this time, but there is no reason for disturbance in the foreign exchange or other markets.

The President is taking this action pursuant to the International Emergency Economic Powers Act, which grants the President authority "to deal with any unusual and extraordinary threat to the national security, foreign policy, or economy, of the United States." [15 Presidential Documents (Part 2) 2117 (Nov. 14, 1979).]

### The President's message notifying Congress of the freeze stated:

TO THE CONGRESS OF THE UNITED STATES:

Pursuant to Section 204(b) of the International Emergency Economic Powers Act, 50 U.S.C.A. sec. 1703, I hereby report to the Congress that I have today exercised the authority granted by this Act to block certain property or interests in property of the Government of Iran, its instrumentalities and controlled entities and the Central Bank of Iran.

1. The circumstances necessitating the exercise of this authority are the recent events in Iran and the recent actions of the Government of Iran.

2. These events and actions put at grave risk the personal safety of United States citizens and the lawful claims of United States citizens and entities against the Government of Iran and constitute an extraordinary threat to the national security and foreign policy of the United States.

3. Consequently, I have ordered blocked all property and interests in property of the Government of Iran, its instrumentalities and controlled entities and the Central Bank of Iran which are or become subject to the jurisdiction of the United States or which are or come within the possession of persons subject to the jurisdiction of the United States. I have authorized the Secretary of the Treasury to employ all powers granted to me by the International Emergency Economic Powers Act to carry out the blocking.

4. Blocking property and property interests of the Government of Iran, its instrumentalities and controlled entities and the Central Bank of Iran will enable the United States to assure that these resources will be available to satisfy lawful claims of citizens and entities of the United States against the Government of Iran.

5. This action is taken with respect to Iran for the reasons described in this report.

/s/ Jimmy Carter

[15 Presidential Documents (Part 2) 2118 (Nov. 14, 1979).]

In briefing the press on November 14, 1979, the Secretary of the Treasury, G. William Miller, reiterated the economic purposes underlying the freeze order and pointed out that the claims of U.S. nationals were intended to include "possible claims for property that has been taken by the Iranian government." Also on that day, the Treasury Department issued regulations implementing the freeze. The regulations prohibited any attachment, judgment, lien, or execution against Iranian property unless licensed by the Treasury. In November and December 1979, the Treasury licensed prejudgment attachments against Iranian property subject to the freeze, but the regulations still prohibited the entry of any judgment and execution against such property. The President retained the power to amend, modify, or revoke the attachments. Following promulgation of the Treasury regulations, many U.S. claimants filed lawsuits against Iran and various of its instrumentalities and obtained prejudgment attachments against the frozen Iranian assets. Beginning in early 1980, the U.S. Government

urged American courts to stay the lawsuits pending resolution of the hostage crisis.

Throughout the hostage crisis the United States had two overriding policy objectives: (1) The protection of the well-being of the hostages and their safe release at the earliest possible moment and (2) the protection of the honor and vital national interests of the United States. Although the articulated purpose of the freeze was economic—to prevent a perceived harm to the United States economy that would be caused by the withdrawal of Iranian deposits and to protect U. S. claimants—the Administration's primary concern was possession of a bargaining chip to force negotiations for the return of the American hostages.

At the end of 1979, no forum existed in which petitioner could bring an expropriation claim against Iran either in the United States, Iran, or any other jurisdiction. Unlike the commercial claims for which U.S. claimants could obtain valid prejudgment attachments under the Treasury regulations because Iran's sovereign immunity for such claims had been waived under the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. secs. 1602-1611 (1982), and the bilateral Treaty of Amity, Economic Relations, and Consular Rights with Iran (1955), 8 U.S.T. 899, T.I.A.S. 3853 (see note 4, *infra*), petitioner was prevented from obtaining a valid prejudgment attachment or suing in the United States on its expropriation claim. Additionally, Doreen/IMCO did no business and had no assets in the United States which petitioner could reach in a lawsuit. Recourse in Iranian courts was also impossible. For these reasons, petitioner did not seek to obtain a prejudgment attachment or file a lawsuit against Iran in any American or Iranian court with respect to its claim for its Doreen/IMCO losses.

Throughout 1979 and well into 1980, Iran was in a state of political chaos and lacked an organized leadership with the power or ability to negotiate the release of the hostages or a settlement of claims. On November 17, 1979, Khomeini directed the militants to release the women and black hostages, but this positive development was countered by the threats of Iranian officials that the remaining hostages would be tried for espionage. Although the Shah left the United States for Panama on December 15, 1979, Iran still

refused to discuss release of the hostages. Iran also refused to recognize a United Nations Security Council resolution, adopted in December 1979, calling for the immediate release of the American hostages and to comply with an International Court of Justice order, issued in late 1979, to release the hostages. The Soviet Union's invasion of Afghanistan on December 27, 1979, created additional tensions by threatening Iranian sovereignty and further complicating efforts to involve the international community in obtaining the hostages' release.

After the hostages were seized, United Nations Secretary-General Kurt Waldheim attempted to negotiate their release with various Iranian officials. By November 17, 1979, the United States worked out a four-point statement of its position that Waldheim conveyed to Iranian authorities. On December 31, 1979, Waldheim visited Iran on a mediation mission carrying the following elaboration of that position:

1. All U.S. personnel held hostage must be released from Iran prior to the institution of any international tribunal.

2. The United States was prepared to work out in advance a firm understanding on arrangements for the airing of Iranian grievances before an appropriate forum after the hostages had been released.

3. The United States would not object to any Iranian suits in U.S. courts to recover assets allegedly taken illegally from Iran by the former Shah.

4. The United States would affirm jointly with Iran its intention to abide by the Declaration on Principles of International Law Concerning Friendly Relations and Cooperation Among States in Accordance with the Charter of the United Nations and by the provisions of the Vienna Convention on Diplomatic Relations. The United States stated that it accepted the present government of Iran as the legitimate authority in Iran and reaffirmed the view that the people of Iran had the right to determine their own form of government.

5. The United States was willing, once the hostages were safely released, to seek, in accordance with the UN Charter, a resolution of all issues between the United States and Iran.

Upon his arrival in Tehran, Waldheim encountered large and hostile demonstrations against the United Nations and the United States. Although Waldheim met with Iranian leaders during the first week of January 1980, his mission to stimulate negotiations for the release of the hostages was totally unsuccessful. After Waldheim returned from Iran, the United States prepared a more complete statement of

the U.S. position in an effort to convince the Iranians that the U.S. was willing to agree to a mutually honorable end to the crisis. On January 13, 1980, the United States passed to Waldheim a six-point elaboration of the U.S. position that contained the following explanation of the U.S. position with respect to U.S. claimants:

Once the hostages are safely released, the United States is prepared to lift the freeze of Iranian assets and to facilitate normal commercial relations between the two countries, on the understanding that Iran will meet its financial obligations to U.S. nationals and that the arrangements to be worked out will protect the legitimate interests of U.S. banks and other claimants. The United States is prepared to appoint members of a working group to reach agreement on those arrangements.

The proposal was transmitted to Iranian leaders but drew no response.

Shortly after the failed Waldheim mission, moves to establish a United Nations commission of inquiry to address Iranian grievances against the United States failed, as did the United Nations Security Council resolution for economic sanctions against Iran because of the Soviet Union's veto. The United States, nonetheless, indicated its intention to impose sanctions on Iran and urged its allies to do the same.

In the spring of 1980 when it was clear that Iran's internal power struggle was preventing an end to the crisis, President Carter increased the pressure on Iran to negotiate. In April 1980, he formally broke diplomatic relations with Iran, imposed additional economic sanctions on Iran, and launched a failed military rescue mission to free the hostages. The European community and Japan also imposed economic sanctions on Iran in May 1980.

From November 1979 to the fall of 1980, Iran made virtually no move to discuss the hostage issue, although the Shah had died in Egypt in July 1980. During that time, the only communications between the United States and Iran had been unofficial discussions through private channels, including the U.S. banks holding frozen Iranian assets. By mid-August 1980, after months of internal political struggle, Iran had a new Parliament and Prime Minister. The catalyst for negotiations between Iran and the United States occurred in September 1980 when Khomeini ad-

vanced the following four conditions which the United States would have to meet to obtain the release of the hostages: (1) Pledge that it would not intervene in the internal affairs of Iran, (2) return all of the frozen Iranian assets to Iran, (3) cancel all U.S. claims against Iran, and (4) return the wealth of the Shah of Iran.

Shortly thereafter, the United States and Iran began conducting negotiations through intermediaries, which were interrupted by the start of the Iran-Iraq war on September 22, 1980. The combination of Iran's diplomatic isolation, an economy severely strained by sanctions, the drawdown of financial reserves which were not replenished because of much reduced oil sales, and the general unavailability of military resupply spurred Iran's willingness to negotiate the release of the hostages. The pendency of the American presidential campaign during the period November 1979 to November 1980 and the impending change in Administration and negotiating strategies due to take place on January 20, 1981, were also background factors in Iran's decision to resolve the hostage crisis. Negotiations between the United States and Iran resumed in November 1980 after the Iranian Parliament formally approved the four conditions for release of the hostages advanced by Khomeini.

In November 1980, the United States officially responded to Iran's four conditions by stating that it would: (1) Agree to nonintervention; (2) return approximately $5.5 billion of frozen Iranian assets, but not release the remainder until something was done about Iran's borrowings from U.S. banks and the judicial attachments previously obtained by U.S. claimants; (3) bring about the cancellation of claims provided Iran agreed to allow claimants to submit claims to an international arbitral tribunal and to pay awards made by the tribunal; and (4) facilitate litigation for the return of the Shah's assets.

As a result of negotiations between the two countries, on January 19, 1981, the United States and Iran reached an agreement for the release of the hostages known as the "Algiers Accords." Under the terms of the Accords, the hostages were released and flown to West Germany on January 20, 1981. Their claims against Iran were barred by the Accords. Iran agreed to pay outstanding U.S. bank

loans in full, and the United States agreed to return the frozen assets to Iran under the terms of the Accords. The Algiers Accords and the related Executive Orders implementing them also terminated all legal proceedings in U.S. courts involving claims against Iran, revoked the attachments against Iran's property, and established the Iran-United States Claims Tribunal at the Hague to resolve claims through binding international arbitration rather than in U.S. courts.

Under the Accords, Iran agreed to establish a $1 billion security account in the Hague with the frozen assets which Iran agreed to replenish if the account fell below $500 million. This account would be used to pay arbitral awards by the Claims Tribunal against Iran in settlement of American commercial and expropriation claims. The Supreme Court upheld the Algiers Accords and the President's power to vacate attachments and suspend litigation against Iran in *Dames & Moore v. Regan*, 453 U.S. 654 (1981).

In November 1979, the Treasury Department estimated that the amount of frozen Iranian assets totalled $8 billion. In the spring of 1980, the Treasury Department determined the frozen assets amounted to between $11 and $12 billion. In 1982, the Treasury Department estimated that Claims Tribunal awards in favor of U.S. claimants would exceed $4 billion.

On its Federal income tax return for 1979, petitioner deducted a long-term capital loss for its expropriated stock in Doreen/IMCO of $955,000 and claimed an ordinary bad debt deduction of $6,913,116[2] for its expropriated loans to Doreen/IMCO. Respondent disallowed the losses.

On November 16, 1981, petitioner filed a claim in the Claims Tribunal seeking damages from Iran of approximately $10 million for the expropriation of its property. In 1984, petitioner finally settled its claim for $2,955,000. After deducting expenses incurred in connection with the settlement, petitioner included $2,297,942 of the settlement in income on its 1984 Federal income tax return.

---

[2]The parties agree that the amount of petitioner's loans to Doreen/IMCO eligible for the deduction is $6,952,875.

OPINION

Section 165(a) provides that, as a general rule, a deduction shall be allowed for "any loss sustained during the taxable year and not compensated for by insurance or otherwise." A loss is not sustained during a taxable year if "a claim for reimbursement of a loss" exists "with respect to which there is a reasonable prospect of recovery;" deductibility is postponed until it is determined with "reasonable certainty" whether or not such reimbursement will be received and its amount. Sec. 1.165-1 (d)(2)(i), Income Tax Regs.[3] The parties are in agreement as to the amount of petitioner's claimed losses, the allocation of that amount between its stock in, and indebtedness to it of, Doreen/IMCO, and that, at least for the purpose of determining whether a loss occurred by virtue of expropriation by Iran, both the stock and the indebtedness were expropriated in 1979. The issue to be decided is whether petitioner sustained a loss from expropriation deductible in 1979. The issue is one of fact and the burden of proof is on petitioner. *Korn v. Commissioner*, 524 F.2d 888, 890 (9th Cir. 1975), affg. a Memorandum Opinion of this Court; *Estate of Fuchs v. Commissioner*, 413 F.2d 503, 507 (2d Cir. 1969), affg. a Memorandum Opinion of this Court.

Petitioner initially contends that it is entitled to deduct its losses because, at the end of 1979, it had no legal remedy against Iran enforceable either in the courts of Iran or in the courts of the United States or in any other forum, and that, on the authority of *Colish v. Commissioner*, 48 T.C. 711 (1967), there is no necessity to determine whether it had a reasonable prospect of recovery. Petitioner further contends that, in any event, it did not have a reasonable prospect of recovery at that time. Respondent counters with the argument that a sufficient basis for petitioner's claim existed under the circumstances herein and that the issue to

---

[3]Sec. 1.165-1(d)(2)(i), Income Tax Regs., in pertinent part, reads:

(2)(i) If a casualty or other event occurs which may result in a loss and, in the year of such casualty or event, there exists a claim for reimbursement with respect to which there is a reasonable prospect of recovery, no portion of the loss with respect to which reimbursement may be receive is sustained, for purposes of section 165, until it can be ascertained with reasonable certainty whether or not such reimbursement will be received. Whether a reasonable prospect of recovery exists with respect to a claim for reimbursement of a loss is a question of fact to be determined upon an examination of all facts and circumstances.

be resolved is simply whether, as of December 31, 1979, a reasonable prospect of recovery existed.

We turn to petitioner's initial contention, noting that, apart from the possible ultimate satisfaction of petitioner's claims out of the assets of Iran frozen by President Carter on November 14, 1979, respondent does not contend that, as of December 31, 1979, petitioner had any remedy or could obtain relief for the expropriation in the courts of Iran or in the courts of the United States, either directly or indirectly by way of attachment of Iran's assets, or that any other forum existed which had jurisdiction over its claim. Although petitioner appears to have had a claim based upon international law, there was no remedy whereby such a claim could be enforced in 1979 because of Iran's ability to rely on its sovereign immunity[4] and on the "act of state" doctrine.[5] See *Callejo v. Bancomer, S.A.*, 764 F.2d 1101, 1116-1117 (5th Cir. 1985); *McDonnell Douglas Corp. v. Islamic Rep. of Iran*, 758 F.2d 341, 345-346 (8th Cir. 1985); *American Intern. Group v. Islamic Republic of Iran*, 493 F. Supp. 522, 524-525 (D.D.C. 1980), modified on other grounds 657 F.2d 430 (D.C. Cir. 1981); see also *Kalamazoo Spice Extraction Co. v. Provisional Military Government of Socialist Ethiopia*, 729 F.2d 422, 424-427 (6th Cir. 1984); cf. *Berkovitz v. Islamic Republic of Iran*, 735 F.2d 329, 333 (9th Cir. 1984). Rather, respondent's position is that the freezing of the assets put flesh on the bones of petitioner's theoretical claim under international law.

In *Colish v. Commissioner, supra*, the taxpayer's property was expropriated in 1950 by Czechoslovakia. In 1952, the

[4]Under art. XI, par. 4 of the Treaty of Amity, Economic Relations, and Consular Rights between the United States and Iran (1955), 8 U.S.T. 899, T.I.A.S. 3853, the latter waived the defense of sovereign immunity only in respect of "commercial, industrial, shipping or other business activities" carried on within the United States, categories which do not encompass the expropriations of petitioner's stock in, and debt of, Doreen/IMCO. Moreover, art. IV, par. 2 of the treaty, which provides for the payment of compensation for the taking of property, did not create an enforceable claim in petitioner in respect of the expropriation, independent of the limited sovereign immunity waiver contained in art. XI, par. 4. See *Kalamazoo Spice Extraction Co. v. Provisional Military Government of Socialist Ethiopia*, 729 F.2d 422, 425 (6th Cir. 1984); *American Intern. Group v. Islamic Republic of Iran*, 493 F. Supp. 522 (D. D.C. 1980), modified on other grounds 657 F.2d 430 (D.C. Cir. 1981). See also the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. secs. 1602-1611 (1982).

[5]The "act of state" doctrine is a counterpart of sovereign immunity and precludes a U.S. court from passing judgment on the validity of actions taken by a foreign state within its territory. For a thorough discussion of this doctrine, the defense of sovereign immunity, and the impact of a treaty exception, see *Callejo v. Bancomer, S.A.*, 764 F.2d 1101, 1112-1114 (5th Cir. 1985).

Treasury Department blocked some Czech property in the United States and in 1954 sold the property and held the proceeds pending disposition of American property claims against Czechoslovakia. In 1958, Congress amended the International Claims Settlement Act of 1949 to dedicate the proceeds to the payment of the claims of American nationals against Czechoslovakia to be adjudicated by a settlement commission. In 1962, the taxpayer obtained a settlement of his claim for expropriation of his property. On his 1962 Federal income tax return, the taxpayer deducted a loss of the difference between his basis and the amount he received in the settlement. In this Court, the taxpayer contended that, until 1962, he had a reasonable prospect of recovery and therefore 1962 was the proper year for him to deduct his loss. Respondent argued that the proper year for the deduction was 1950 because, at that time, no claim for reimbursement existed as to which there was a reasonable prospect of recovery.

We first found that prior to the 1958 legislation "Americans whose property had been confiscated by the Czechoslovakian Government had had no rights to any compensation whatsoever." *Colish v. Commissioner,* 48 T.C. at 712. We further concluded that "it was evident that [in 1950] the government of Czechoslovakia did not intend to reimburse American nationals for their interests which were expropriated." 48 T.C. at 716. We then rejected the taxpayer's argument that, based upon the history of the United States providing for American claimants' expropriation claims against other foreign governments through control over foreign assets, there was a reasonable prospect that the U.S. Government would utilize Czechoslovak assets in the United States to compensate American nationals in taxpayer's position. In so doing, we stated:

Though we find this argument appealing, we think that petitioner had a deductible loss "not later than 1950." The reason is that unless there exists a claim based on a legal right for reimbursement from a third party in the year a loss occurs, the loss must be deducted in that year. The prospect of recovery must be based on firmer ground than the possibility of a gratuitous reimbursement from a third party. *Remington Typewriter Company,* 4 B.T.A. 880 (1926); *Estate of Zinaida Bary v. Commissioner,* 368 F.2d 844 (C.A. 2, 1966), affirming a Memorandum

Opinion of this Court; *United States v. White Dental Co., supra* [274 U.S. 398 (1927)].

It is the reasonable prospect of an existing right to be reimbursed as well as the reasonable prospect of being in fact reimbursed which determines. As was pointed out in *Remington Typewriter Company, supra* at 889:

There was, undoubtedly, a moral obligation on the United States to pay the funds received, if any, to the individuals who had suffered losses at the hands of the enemy. There was, however, only a possibility of payment—an expectancy of interest in the fund, that is, a possibility coupled with an interest. This expectancy of interest was not in existence in 1918 when the losses were sustained.

* * * Petitioner should not be indefinitely held to account upon the idea that something may happen in the future, which will change the *existing* conditions. * * * [Emphasis supplied.]

In the present case, despite past actions of the United States and the petitioner's hope that he would eventually be reimbursed for his loss by the United States, petitioner had no existing right to reimbursement until 1958 when title IV of the International Claims Settlement Act of 1949 was passed; consequently, no claim for reimbursement existed at the time of nationalization. Petitioner's knowledge or belief of future rights, in the absence of an existing right, is immaterial. Petitioner's heavy reliance on the fact that Czechoslovakian assets were available for seizure at the time of nationalization as a distinguishing factor from cases previously decided in this area is misplaced, for the existence of the assets created no rights.

[48 T.C. at 717.[6]]

Subsequent cases have adopted the *Colish* reasoning. *Korn v. Commissioner, supra; Estate of Fuchs v. Commissioner, supra; Schweitzer v. Commissioner,* 376 F.2d 30 (3d Cir. 1967), affg. a Memorandum Opinion of this Court; *Major v. Commissioner,* T. C. Memo. 1969-69.

Respondent urges that the combination of the President's freeze of Iran's assets and his announced intention to use those assets to obtain satisfaction for American claimants distinguishes this case from prior cases and justifies the conclusion that the requirement of the regulations that "there exists a claim for reimbursement" has been satisfied. See note 3, *supra.* Recognizing that this distinction might not be accepted and that his position herein might be viewed as being in conflict with the position he has consistently taken in the past, respondent also urges us to revisit *Colish* and the cases which followed.

---

[6]See also *Stern v. Commissioner,* 5 B.T.A. 89 (1926).

We note that the cases decided after *Colish* do not always draw the sharp distinction between the two elements, i.e., existence of a claim for reimbursement and reasonable prospect of recovery on that claim. Moreover, as will subsequently appear, we conclude that, even if a claim for reimbursement could be said to exist as of December 31, 1979, petitioner did not, as of that date, have a reasonable prospect of recovery in respect of the expropriation by Iran of its stock in, and indebtedness to it of, Doreen/IMCO. Under these circumstances, we find it unnecessary to revisit *Colish* and the other decided cases in order to dissect, modify, or reject language utilized in the opinions. Accordingly, we proceed to consider whether petitioner had a reasonable prospect of recovery as of December 31, 1979. We observe, however, that the absence of an existing legal remedy is an element to be taken into account in resolving that issue.

Initially, we deal with the effect, if any, to be given to post-1979 events. It is clear that subsequent events should not be given determinative significance. See *United States v. S. S. White Dental Mfg. Co.*, 274 U.S. 398, 403 (1927). As the Fifth Circuit Court of Appeals stated in *Estate of Mann v. United States*, 731 F.2d 267, 278 (5th Cir. 1984), in resolving the issue of worthlessness of a bad debt which involves essentially the same determination, i.e., the existence of a reasonable prospect of recovery:

> In sum, we hold that events subsequent to a given taxable year—events which may include repayment before the bad debt deduction claim is filed—neither prove nor disprove whether the business debt was worthless in that year. If and when such a debt becomes wholly worthless must be determined from the facts and circumstances known or which reasonably could have been known at the end of the year of asserted worthlessness. [19]

---

[19]Of course, proof of subsequent events may be allowed, as they were here, insofar as they may be relevant to the reasonableness of a conclusion that a debt became worthless in the particular year in issue.

It is within the foregoing limitations that we have admitted evidence of post-1979 events and will utilize such evidence in resolving the issue of whether a reasonable prospect of recovery existed at year's end 1979. In this connection, we note that post-1979 events may serve not

only to confirm a conclusion that there was a reasonable prospect of recovery but also to reinforce a conclusion that there was not such a prospect at that time.

In this vein, we believe that, under the circumstances of this case, the fact that petitioner may have expended time and money through its attorneys to follow the course of events after 1979, in order to be in a position to pursue its claim in an appropriate forum if one should be created (as it was by virtue of the Algiers Accords), has only peripheral significance. We recognize that the decided cases generally take the position that the fact that a taxpayer goes to the trouble and expense of pursuing litigation after the claimed year of loss is an indication that there was a reasonable prospect of recovery. E.g., *Dawn v. Commissioner*, 675 F.2d 1077 (9th Cir. 1982), affg. a Memorandum Opinion of this Court; *Ramsey Scarlett & Co. v. Commissioner*, 521 F.2d 786 (4th Cir. 1975), affg. 61 T.C. 795 (1974); *Parmalee Transportation Co. v. United States*, 173 Ct. Cl. 139, 351 F.2d 619 (1965); *Estate of Scofield v. Commissioner*, 266 F.2d 154, 159 (6th Cir. 1959), revg. and remanding 25 T.C. 774 (1956). But none of these cases lay down any hard and fast rule and some of the opinions clearly recognize that the subsequent pursuit of litigation is not determinative. See, e.g., *Parmalee Transportation Co. v. United States*, 351 F.2d at 629; *Estate of Scofield v. Commissioner*, 266 F.2d at 159; see also *Gale v. Commissioner*, 41 T.C. 269, 275 (1963). Moreover, we think it significant that, in the above cases, a present legal remedy and a forum for enforcing such remedy existed, a situation which does not obtain herein.

To the extent that respondent's argument along this line seeks to impute to petitioner a subjective view that it had a reasonable prospect of recovery, such a view would be only one element in, and not the sole determinant of, the existence of a reasonable prospect of recovery. *Boehm v. Commissioner*, 326 U.S. 287, 292-293 (1945). Nor do we agree with respondent's attempt to strengthen his argument by pointing to the fact that petitioner refused to respond to certain of respondent's pretrial discovery requests about the activities of its lawyers because of a properly asserted claim of attorney-client privilege. *A. B. Dick Co. v. Marr*, 95 F. Supp. 83, 101 (S.D.N.Y. 1950); *Furstenberg v. Commis-*

*sioner*, 83 T.C. 755, 780 n. 17 (1984); see also 1 Jones on Evidence, sec. 3:93 (S. Garth 6th ed. 1972). Similarly, we attach no significance to the fact that petitioner failed to question its attorney, who was called as a witness by respondent, with respect to facts bearing on petitioner's prospects for recovery; since the witness was readily available to respondent for questioning, no presumption should attach to petitioner's trial conduct in this respect. See *United States v. Cook*, 771 F.2d 378, 383 (8th Cir. 1985); see 1 Jones on Evidence, *supra*.

We take a similar view of petitioner's sending representatives to shareholders' and board of directors' meetings in 1979, 1980, and 1981 which appear to represent no more than formalistic efforts to protect whatever remote chance for recovery might develop. In short, we think that petitioner, in taking the foregoing actions, was simply acting in an attempt to make sure that it was not left out in the cold, as the situation might evolve. In any event, we are prepared to assume, for the purposes of evaluating petitioner's prospect of recovery, that it was at all times, through its officers and its attorneys, fully cognizant of the purposes and actions of the Carter administration and of activities through private channels, such as the banks, as well as of the progress and outcome of proceedings in international forums, such as the United Nations, and in the courts of the United States and of other nations.

Finally, in evaluating the significance of petitioner's attitude, we have noted that petitioner, at an early date, recognized that its investment in, and loans to, Doreen/IMCO were likely to be worthless. Thus, effective July 1979, it established a reserve account for Doreen/IMCO losses and made monthly additions thereto so that, at the end of 1979, it had reserved an amount only slightly less than the amount deducted on its 1979 tax return. We are not impressed with respondent's argument that petitioner's reserve was based on a foundation of worthlessness independent of Iran's expropriation (an issue which we do not reach herein, see page 781, *infra*). The fact of the matter is that, by July 1979, the expropriation had occurred. Petitioner's recording of the impact of the events in Iran on its financial position was, irrespective of the phraseology it

used to describe the consequences of the events, consistent with its claim of a loss deduction on its tax return and in this proceeding.

In determining whether a reasonable prospect of recovery existed as of December 31, 1979, we start from the premise that petitioner is not required to avoid both "the Scyllian role of the 'incorrigible optimist' and the Charybdian character of the 'stygian pessimist.'" *Minneapolis, St. Paul & Sault Ste. Marie Railroad Co. v. United States,* 164 Ct. Cl. 226, 241 (1964). See also *United States v. S. S. White Dental Mfg. Co.,* 274 U.S. at 403. The standard to be applied is the "exercise of sound business judgment based upon as complete information as is reasonably obtainable." *Minneapolis, St. Paul & Sault Ste. Marie Railroad Co. v. United States, supra* at 241.

On December 31, 1979, the lives of 52 American hostages in Iran hung in the balance. Although the grounds for the freezing of Iran's assets had been articulated in economic terms, it is clear that the Carter Administration considered the welfare of the hostages of primary, and the protection of U.S. claimants of secondary, national concern. To have elevated the protection of U.S. claimants to an equal policy status with that of the fate of the hostages would have caused the latter to be hostages of the claimants as well as of Iran. In this connection, we note that the five-point position of the United States carried to Iran by the Secretary-General of the United Nations on December 31, 1979 (see page 764, *supra*) clearly sets forth the prime importance of the release of the hostages and contains, at most, a camouflaged reference to the settlement of the claims of U.S. citizens.

The crux of respondent's case is that, as of the end of 1979, the freezing of Iran's assets was in place, and the President was committed to assuring that the freeze would be lifted only in the context of an overall settlement which provided for both the return of the hostages and an appropriate remedy to enable the U.S. claimants to realize on their claims, including claims for expropriation. Consequently, respondent argues that this combination of the freeze and commitment distinguishes the instant situation

from prior cases which involved, at most, a mere authorization to seize assets.

We have no doubt as to the President's intention to protect U.S. claimants, but we are satisfied that it did not rise to the level of a binding commitment. It is apparent that, at all times, the President retained complete flexibility in respect of the disposition of U.S. claims and had plenary power to lift the freeze and void any attachments that may have been obtained without providing for U.S. claimants. *Dames & Moore v. Regan,* 453 U.S. at 669-675, 687. In this regard, we do not agree with respondent that such attachments complicated the situation so severely as to restrict the ability of President Carter simply to lift the freeze. See *American Intern. Group v. Islamic Republic of Iran,* 657 F.2d at 448 ("The holder of the interests [attachments] had no reasonable expectation that, against the factual backdrop of an unresolved international crisis, the President would not have revoked what he had granted.").

Furthermore, we are constrained to note that, at the end of 1979, a presidential election year was at hand. In light of the intense concern of the American people over the fate of the hostages, we think that the potential political fallout from the handling of the question of the release of the hostages cannot be ignored. In so stating, we are not suggesting that domestic politics would have controlled the U.S. attitude in resolving the hostage question. But, given the varying degrees of volatility in the international atmosphere in general that have existed since World War II and the tensions in the United States-Iran relationship at the end of 1979, we are not persuaded to rule out the possibility of a tradeoff of a simple lifting of the freeze in exchange for the hostages during the short period between November 14 and December 31, 1979. We are not convinced that such a procedure would, as respondent suggests, have been viewed as violating U.S. policy against paying ransom, as might have been the case if the tradeoff had provided for the payment of U.S. funds or the cancellation of the claims of U.S. citizens.

We recognize that, in the period between November 4 and December 31, 1979, Iran was not likely to propose or accept such a tradeoff. Indeed, there was no government suffi-

ciently in control in Iran to negotiate, let alone conclude, a settlement of any kind. But this negative state of affairs in no way supports respondent's contention that President Carter would, under no circumstances, have accommodated the protection of U.S. claimants to obtaining the release of the hostages, if he had somehow been given the opportunity to do so.

A tradeoff of the lifting of the freeze for the hostages would have left petitioner without any remedy, in U.S. or Iranian courts or any other forum, for whatever claim it had because of the expropriation. In this connection, we think it important to note that respondent blithely lumps all U.S. claimants together when, in fact, a large number of them had claims involving commercial activities for which a legal remedy was available in the United States at least to the extent of obtaining attachments even though not final judgments. President Carter's alleged commitment to protect U.S. claimants might have been sufficiently satisfied if a settlement could have been obtained which would have protected the rights of those claimants but not those whose claims were based solely on expropriation and who did not have any legal remedy available to them at the end of 1979. In short, we are not persuaded that the attachments and other legal proceedings by U.S. claimants offered any significant cover of protection for claimants such as petitioner.

We are not prepared to accept respondent's assertion that a reasonable prospect of recovery existed because it was likely that, if the hostages had been harmed, the President would have vested the frozen Iranian assets and thus created a fund with which to compensate U.S. claimants. Such an approach is purely speculative to say nothing of its macabre quality. The fact of the matter is that there was no such action by Iran or the United States prior to December 31, 1979, nor is there any evidence, as of that date or for that matter at any time thereafter, that such action was likely. Moreover, had this eventuality occurred, it might well have produced a state of war (whose scope might not have been limited to the two countries involved) with the ultimate protection of U.S. claimants dependent upon the

outcome of the conflagration.[7] See *United States v. S. S. White Dental Mfg. Co.*, 274 U.S. at 402.

As of December 31, 1979, Iranian political power was in a state of disarray, and the United States had been unable even to commence negotiations with Iran to resolve the crisis even though a principal stumbling block had been removed, i.e., the Shah had left the United States for Panama. Not until the fall of 1980, after a series of events occurred in 1980, including the Iranian clerical faction's assumption of power, the outbreak of the Iran-Iraq war, increased United States economic sanctions against Iran, the failed American rescue mission, the death of the Shah, and the impending change in the U.S. Administration, did Iran make overtures to settle the crisis. If anything, these critical events are so clearly independent of the factual circumstances that existed as of December 31, 1979, as to reinforce the conclusion that the elements of a reasonable prospect of recovery were absent, rather than present, as of that date. Equally clearly, the fact that the Algiers Accords came into being in 1981 is not, in and of itself, an indication that such a prospect of recovery existed. *Colish v. Commissioner, supra* at 717; *Estate of Fuchs v. Commissioner, supra* at 508.

As we view the situation, the ability of the Carter Administration to obtain satisfaction of U.S. claims turned upon its ability to negotiate an agreement with Iran, which simply did not exist as of the end of 1979, although it was conceivable that some agreement of unknown content could have been achievable at an indeterminate future date. As we observed at trial, it takes two to tango and that was simply not in the cards as of December 31, 1979. Respondent seeks to avoid the impact of this observation by arguing: (1) Iran would not accept a mere lifting of the freeze and would not release the hostages without the cancellation of the claims of U.S. citizens; (2) the U.S. would not cancel the claims[8] even to obtain the release of the hostages; therefore (3) a negotiated settlement along the lines that ultimately emerged in the Algiers Accords was

---

[7]Indeed, on Dec. 26, 1979, Khomeini said, "Now we are at war, at political and economic war. It is possible that the military war could follow."

[8]There were potential constitutional considerations in canceling U.S. claims. See *Dames & Moore v. Regan,* 453 U.S. 654, 674 n. 6, 688-690 (1981).

inevitable. We reject this syllogism. It does not follow from the facts that, if one party will not dance the foxtrot and the other will not dance the waltz, they are willing to do the tango or any other dance step together.

The Supreme Court has admonished us, in resolving cases such as this, to take a flexible and practical approach. See *Boehm v. Commissioner*, 326 U.S. at 293. In this vein, we conclude, that contrary to respondent's assertion, a recovery light did not exist at the end of the tunnel of the uncertainties present at the end of 1979, which could reasonably have been perceived by petitioner at that time. To conclude otherwise, would, in our opinion, impose upon petitioner the necessity of having had to make delicate political, economic, and diplomatic judgments in the complex arena of international, as well as domestic, relationships. This is a task which we do not think any taxpayer should be required to undertake, even one as sophisticated and knowledgeable as petitioner appears to have been. In this connection, we note that the factors in the instant case are entirely different from those involved in making a judgment as to worthlessness where only business facts are involved and the taxpayer has the full capacity to ascertain the pertinent facts and make his own evaluation of their impact.

We hold that petitioner has carried its burden of proof that it suffered losses deductible in 1979 in respect of its stock in, and indebtedness to it of, Doreen/IMCO as a result of the expropriation by Iran.[9] In view of this holding, we need not consider petitioner's alternative argument that the Doreen/IMCO stock and debt was worthless irrespective of the expropriation.

To reflect the concessions of the parties on other issues,

*Decision will be entered under Rule 155.*

---

[9]Our analysis and conclusion is equally applicable to the situation which existed at the time petitioner filed its 1979 return, namely, July 21, 1980. Cf. *Qureshi v. Commissioner*, T.C. Memo. 1987-153.