## APPEAL OF REMINGTON TYPEWRITER COMPANY.

Docket No. 2788.    Decided September 22, 1926.

Upon the evidence, *held*, that debts owing to petitioner by certain foreign subsidiaries which it charged off during the year 1918 were worthless and constituted proper deductions from gross income for that year; also that petitioner's investments in corporations in Germany and Austria-Hungary were worthless on December 31, 1918, and were deductible as losses sustained within that year.

*L. P. Mattingly, Esq., Rolland L. Nutt, Esq.,* and *James M. Gifford, Esq.,* for the petitioner.
*P. S. Crewe, Esq.,* for the Commissioner.

This is an appeal from the determination of a deficiency in income and profits tax for the year 1918 in the amount of $513,064.95, arising from the disallowance of deductions claimed on account of worthless debts charged off and loss of investments in foreign subsidiary companies.

### FINDINGS OF FACT.

The petitioner is a New York corporation engaged in the business of manufacturing typewriters and typewriter supplies in the United States and the sale of its products throughout the world, with principal office in New York City. It rendered its returns and kept its books of account on the accrual basis.

Prior to 1918, as a part of its sales plan, petitioner caused the organization of certain foreign sales companies in Germany and Austria-Hungary and acquired their entire capital stock by purchase as follows:

Smith Premier Typewriter Company of Berlin_____ $35, 713. 29
Remington Typewriter Company of Berlin_____   9, 522. 81
Remington Typewriter Company of Vienna_____ 204, 000. 00
Remington Typewriter Company of Budapest_____ 100, 000. 00
                                                                 _____
    Total _____ 349, 236. 10

The investment in stock of the Smith Premier Company of Berlin was made prior to March 1, 1913, and had a fair market value on that date of $35,713.29. The investment in the stock of the other three above-mentioned companies was made in October, 1914. Partial liquidation of the Remington Typewriter Company of Vienna and the Remington Typewriter Company of Budapest was effected prior to 1918, leaving the taxpayer's investment in the stock of these corporations in 1918 as follows:

Smith Premier Typewriter Company of Berlin_____ $35, 713. 29
Remington Typewriter Company of Berlin_____  9, 522. 81
Remington Typewriter Company of Vienna_____  99, 695. 64
Remington Typewriter Company of Budapest_____  25, 809. 69
                                                                 _____
    Total _____ 170, 741. 43

In 1918, two of the above-mentioned foreign corporations were indebted to the petitioner on open accounts for money advanced and for merchandise as follows:

Smith Premier Typewriter Company of Berlin_____ $245, 180. 04
Remington Typewriter Company of Budapest_____ 397, 940. 83
                                                                 _____
    Total _____ 643, 120. 87

The above indebtedness to petitioner was created through advances or loans of money to these subsidiary corporations necessary to their organization and operation, and through the sale of merchandise to them on account at prices and on terms charged any dealers in its product, whether subsidiary or independent in character. All of these foreign corporations were organized for the sole purpose of selling the taxpayer's product.

Owing to the World War and the consequent blockade of the Central Powers, the petitioner was unable to supply these foreign sales corporations with their stock-in-trade after the year 1915. In April, 1917, when the United States entered the war, communications by the petitioner with these foreign corporations were suspended and the last financial reports received were under date of about April 1, 1917, disclosing greatly depreciated inventories. The four foreign corporations operated 56 sales offices prior to April 1, 1917, and had on hand a total supply of 8 new typewriters for sale for all their sales offices. The stock of typewriter supplies, parts and accessories was also low. The other assets consisted of a small amount of cash and accounts receivable of questionable value.

From this information the petitioner believed that these assets would be wiped out by operating expenses and that the corporations would become insolvent in a very short time.

During the year 1918, the petitioner availed itself of every means at its command to determine the real conditions confronting its foreign subsidiaries in Germany and Austria-Hungary. It sent its vice president and comptroller to Europe for personal investigation and report as to the probability or possibility of the payment or collection of the indebtedness and the recovery of its investments. He spent several months investigating conditions relating to accounts due it and to its investments. He visited London, Paris, Italy, and Switzerland and came in contact with those who were best informed as to conditions in Germany and Austria-Hungary. He returned in August, 1918. Upon the information obtained by him, petitioner concluded that the accounts due it and its investments in the foreign corporations were worthless. At the close of the year 1918, the petitioner had information that the Government of Germany maintained an embargo on the importation of typewriters, thus prohibiting these sales corporations in Germany from continuing the business for which they were organized.

As a consequence of the war the resources of Germany and Austria-Hungary became partially exhausted. Having conceded defeat after four years of war in which they had drawn their male population up to the age of 50 into the armies, they were faced with the certainty of having to pay large indemnities. Defeated armies returning to their homes and finding women and children starving, promptly overthrew their respective governments and engaged in a factional struggle for control. Both countries were torn by revolution, their industries were paralyzed, and their supplies of materials and food were exhausted. They had no buying power. They attempted a reorganization of industries to produce and resell their own products to the world. Germany had long been the principal competitor of the American typewriter manufacturers in the European market and hence could produce typewriters for her own needs. The German corporations above-mentioned were under the control of a sequestrator for the German Government who took charge of their business in January, 1918, and continued in control until July, 1923. Upon reassuming control of its business in July, 1923, the Smith Premier Typewriter Company of Berlin began to liquidate as required by the provisions of section 64 of the German Private Limited Companies Act, hereinafter mentioned.

These foreign subsidiary corporations were insolvent at the close of the year 1918. Under the commercial laws of Germany and Austria-Hungary, upon becoming insolvent a corporation must im-

mediately be liquidated. Section 64 of the German Private Limited Companies Act, in force during 1918, provides as follows:

The managers must apply for an adjudication of bankruptcy as soon as the company becomes insolvent or its liabilities are shown to exceed its assets by the annual or by an interim balance sheet. The managers are liable to indemnify the company in respect of all payments made by them from this time on. The provisions of section 43, paragraphs 3 and 4, apply *mutatis mutandis* to the company's claims to indemnity arising out of such liability.

The sequestrator's control of these corporations prevented their liquidation as at the end of the year 1918.

During the war these foreign subsidiary corporations, being unable to get supplies from the parent corporation, purchased old machines locally and rebuilt them for sale. A substantial part of their assets consisted of typewriter supplies of war quality, unsalable after the close of the war, typewriter parts and accessories of no value in liquidation, and of accounts receivable, payable in a depreciated currency. The indebtedness to the petitioner was payable in United States currency.

From the information obtained and the financial conditions existing in these foreign countries, the petitioner determined in 1918 that the sale of American manufactured typewriters in Germany and Austria-Hungary would be impossible for many years, that the enforced liquidation of these corporations was imminent, and that the proceeds of liquidation would scarcely cover liquidation costs, leaving nothing for creditors or stockholders. It therefore caused the debts owing to it by its foreign subsidiary corporations to be written off as worthless in the year 1918.

In 1922, owing to the depreciation of the mark to a point where business organizations in Germany made their computations of currency in figures of extraordinary magnitude, an unlooked for demand was created for the Wahl adding machine, the sale of which the taxpayer controlled. The Wahl adding machines readily made these computations, whereas no machine produced in Germany could satisfactorily do so. For this reason its importation into Germany was permitted. German banking houses and other business organizations having need of this machine ordered it through the Remington Typewriter Company of Berlin, and the petitioner supplied the Remington Typewriter Company of Berlin with these machines so ordered only on the condition that the Remington Typewriter Company of Berlin collect and send to this petitioner in the United States 50 per cent of the purchase price with the order, and that the remaining 50 per cent of the purchase price be paid on delivery.

Notwithstanding these terms, the need for these machines was so great that large numbers were sold in 1922 and 1923, thus enabling the Remington Typewriter Company of Berlin to avoid enforced

liquidation. This unlooked for demand for the Wahl adding machine could not be foreseen in 1918, and, but for the fact of control of the Remington Typewriter Company of Berlin by the sequestrator, it would have been forced into liquidation long prior to 1922.

At the close of the year 1918, the industries of Austria-Hungary were demoralized. The kronen had depreciated to a small fraction of its normal value. The Socialist party was in control of the government and laws had been enacted and were being enforced prohibiting industrial organizations from reducing the salaries or discharging any employees, and were compelling them to employ men who were employed prior to the time they entered the army, regardless of whether or not they had sufficient work or employment for them. On account of such conditions petitioner determined that it would be impossible to reenter Austria-Hungary for the purpose of carrying on its business without subjecting itself to further losses.

The petitioner claimed as a deduction from gross income for 1918 losses on account of its investment in the stock of these foreign subsidiary corporations and debts owing to it by these companies in the amounts set forth in these findings of fact. The Commissioner disallowed these deductions from gross income for the year 1918, claiming that the losses were not sustained, and that the debts were not ascertained to be worthless within the year.

OPINION.

LITTLETON: There is no controversy with respect to the correctness of the amount of the investment in foreign subsidiary companies, nor the amounts owing from them on account of money advanced and merchandise sold. The questions presented are: (1) Was the Remington Typewriter Company of New York entitled to a deduction from gross income for 1918, on account of debts owing to it by certain of its foreign subsidiaries, which it alleges were charged off during that year? (2) Was the Remington Typewriter Company of New York entitled to a deduction from gross income for 1918 on account of claimed losses on investments in certain of these foreign subsidiaries?

In respect of the question of deductibility of debts owing to this petitioner, only two of these foreign subsidiary corporations are involved, one being the Smith Premier Typewriter Company of Berlin and the other the Remington Typewriter Company of Berlin. There were no debts due the home office by the Austria-Hungary Company. Section 234 (a) (5) of the Revenue Act of 1918 provides as follows:

(a) That in computing the net income of a corporation subject to the tax imposed by section 230 there shall be allowed as deductions:

\*       \*       \*       \*       \*       \*       \*

(5) Debts ascertained to be worthless and charged off within the taxable year.

The statute prescribes three conditions precedent to the allowability of deductions for worthless debts—(1) debts must be owing to the petitioner; (2) they must be ascertained to be worthless within the taxable year; and (3) they must be charged off within the taxable year.

It is admitted that on December 31, 1918, the petitioner was creditor on open account of the Remington Typewriter Company of Berlin, in the sum of $397,940.83, and of the Smith Premier Typewriter Company of Berlin, in the sum of $245,180.04.

In the *Appeal of Alemite Die Casting & Manufacturing Co.*, 1 B. T. A. 548, the Board said, in respect of the ascertainment of worthlessness of the debt, "That determination must be based on facts." The president of the petitioner corporation testified that after making every possible investigation, he determined that everything the petitioner had in Germany and Austria-Hungary was a total loss in 1918. Germany had, by embargo, prohibited the importation of typewriters into Germany. Article 1 of the Embargo Act provides that "The importation of goods or merchandise of any description across the borders of the German Empire, shall only be permissible with the consent of competent authority."

The embargo has continued in force since 1918 and is still in force. In January, 1918, a sequestrator for the German Government seized and assumed absolute control of the subsidiary corporations located in that country. He was in control at the close of the year 1918 and continued in control until July, 1923.

The foreign corporations were known to be insolvent and it was also known that their stock of merchandise was exhausted, with the exception of a small stock of parts, accessories and such supplies as could be purchased locally. The last shipment of merchandise had been made by the petitioner to these sales corporations at the end of the year 1915. Financial statements received indicated a state bordering on insolvency as at April 1, 1917. The vice president and comptroller of the petitioner company spent several months in Europe in 1918, investigating the financial conditions of the subsidiary companies. The reports received confirmed petitioner's belief that the debtor corporations in Germany were insolvent in 1918 and that they would be required to liquidate under the provisions of the commercial laws of that country, but, owing to the fact that the sequestrator had taken control, bankruptcy proceedings could

not be instituted according to section 64 of the German Private Limited Companies Act. The taxpayer knew that the principal asset of the subsidiary corporation consisted of accounts receivable, payable in a depreciated currency. The collection of these accounts could not be enforced and by the time payments on the accounts were eventually made the currency had depreciated to such an extent as to make them of practically no value.

The Commissioner contends that the information upon which this petitioner's determination that these debts were worthless was based, was received indirectly. The petitioner based its action upon the most reliable information available, and this information was of the character upon which business men of sound judgment and prudence base their action in business matters. Petitioner knew that the stock-in-trade of these subsidiary corporations was exhausted, that Germany required the immediate liquidation of corporations upon their becoming insolvent, that the German embargo, which was published in 1917, affected all countries trading with Germany, and further, it knew of the seizure of its German companies by the sequestrator of the German Government in January, 1918. Petitioner also had information in regard to the industrial conditions, and the effect thereof on the subsidiary corporations. Upon this information, it was forced to the conclusion that the debts were of no value and that it could not under the circumstances, in good faith, carry these accounts in its financial statements as assets, in the face of such knowledge of their worthlessness. If in the exercise of sound business judgment a taxpayer concludes, after making every possible effort to determine whether there is a reasonable likelihood of payment or recovery of the debt, that the debt is of no value, deduction on account of such debt should be allowed. *Appeal of Egan & Hausman Co.*, 1 B. T. A. 556; *Selden* v. *Heiner*, 12 Fed. (2d) 474.

In connection with the deduction claimed on account of bad debts, the Commissioner contends that petitioner sustained no deductible loss prior to the adjudication of its claim against the German Government by the Mixed Claims Commission. The claim to which the Commissioner refers is a claim against the German Government, growing out of the sequestration of the property of the subsidiary companies in Germany, by the German Government, but no such claim existed prior to 1922, when the Mixed Claims Commission was organized, and further, that the petitioner had no enforced property right whatsoever in the claim when it came into existence, or to the award made thereunder. This matter will be discussed more fully in connection with the next question. We think the debts were ascertained to be worthless and charged off within the year and were a proper deduction from gross income for 1918.

The second question involved in this appeal is with reference to the deduction from gross income for 1918, on account of claimed losses on investments in certain of its foreign subsidiaries. Section 234 (a) (4) of the Revenue Act of 1918 provides as follows:

(a) That in computing the net income of the corporation subject to the tax imposed by section 230 there shall be allowed as deductions:

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(4) Losses sustained during the taxable year and not compensated for by insurance or otherwise.

The conditions precedent to the allowance for deductions on account of losses, are (a), the assets lost must be those of the petitioner, (b), the losses must be sustained during the taxable year, and (c) must not be compensated for by insurance or otherwise. There is no controversy over the amount of the investment that it had in the year 1918. The only question is whether or not the losses were sustained on such investment during the taxable year. Under the statute, losses are deductible within the year in which sustained. Since we have already decided that the indebtedness due petitioner by the German corporations was worthless at the end of the year 1918, we believe upon the same evidence that its investment in these German corporations was likewise worthless as of that date and that a loss was sustained within 1918.

Special Regulations, paragraph 84, with regard to limited liability corporations, in force in Austria-Hungary, provides:

When the balance sheet shows that one-half of the capital has been lost, the manager must immediately convene a general meeting and inform the members of the position of the company.

As soon as the assets of the company do not cover the debts the manager must, on his own responsibility, request the court of law to open bankruptcy proceedings.

The Austria-Hungarian monarchy was dismembered at the close of the war, reducing the territory from 115,000 square miles to 32,000 square miles, and its population from 50,000,000 to 14,000,000. That which remained was divided into two separate nations. Both countries were torn by revolution, creating a laxity in the enforcement of business laws that still existed. The evidence discloses that at the end of the year 1918, these corporations operating in Austria-Hungary did not have sufficient assets to meet their liabilities. Such assets as they had were of war-time quality and accounts receivable payable in a depreciated currency. These corporations, in order to secure funds upon which to subsist during the year 1918, had contracted for the sale of approximately 500 typewriters for delivery within 60 days after termination of the war, and collected on account of such sales 25 per cent of the sales price and spent it. These sales

contracts called for the payment of the purchase price in kronen, the depreciated currency of Austria-Hungary, based on a value of 20 cents in American money, whereas, at the time called for by the contract for the delivery of the machines, a kronen was worth less than five cents and was further depreciating. The stock in these corporations, at the close of the year 1918, had no value and the investments in these companies were a total loss to the petitioner.

The Commissioner argued that this petitioner has sustained no loss because it still has its investment, with the exception of the Smith Premier Typewriter Company of Berlin, which was dissolved in 1923, and assumes that, in order to claim a loss on account of its investment, the corporations must have been liquidated or the stock disposed of. The law does not in every case impose such conditions precedent to a deduction on account of losses, nor has the Treasury Department placed such a construction upon the law. Regulations 45, article 144, provides as follows:

* * * However, if stock of a corporation becomes worthless, its cost or its fair market value as of March 1, 1913, if acquired prior thereto, may be deducted by the owner in the taxable year in which the stock became worthless, provided a satisfactory showing of its worthlessness be made as in the case of bad debts.

The fact that the shell of a worthless corporation continues in business is no bar to the deduction of an investment in that corporation's stock when all facts clearly indicate the stock to be worthless. The evidence establishes the fact that no compensation whatsoever has been received by this petitioner on account of these losses. In the fall of 1922, this petitioner filed a claim with the German Mixed Claims Commission on account of damages claimed by it through sequestration by the German Government of the German subsidiary corporations, in 1918. Prior to the proclamation of the treaty of peace between the United States and Germany, November, 1921, the United States had no right to a claim against the German Government on account of such loss, and at the close of the year 1918 there was no agency in existence with which the petitioner might have filed a claim on account of damages suffered at the hands of the German Government. The issue in this case, however, is whether the citizen or corporation, a national of the United States, as distinguished from the United States, a sovereign power, would have a claim. Upon the authority of the decisions of the Supreme Court in *United States* v. *Weld*, 127 U. S. 51, and *Williams* v. *Heard*, 140 U. S. 529, and a long line of consistent decisions and the evidence of record, we are of the opinion that no individuals or corporations had, as a matter of strict, legal, or equitable right, any lien upon any award or

diplomatic settlement made on its behalf by the Mixed Claims Commission. There was, undoubtedly, a moral obligation on the United States to pay the funds received, if any, to the individuals who had suffered losses at the hands of the enemy. There was, however, only a possibility of payment—an expectancy of interest in the fund, that is, a possibility coupled with an interest. This expectancy of interest was not in existence in 1918 when the losses were sustained.

The loss sustained by the petitioner was a deductible loss during the year 1918, within the meaning of the statute, and comes within the rule laid down by the court in *White Dental Mfg. Co.* v. *United States*, 61 Ct. Cl. 143, decided November 9, 1925, and by the Board in the *Appeal of Midland Coal Co.*, 1 B. T. A. 311, and *Appeal of George Leavenworth*, 1 B. T. A. 754. Because the petitioner now has a claim which may or may not be paid, does not alter the fact that it suffered a loss in the year 1918. Petitioner should not be indefinitely held to account upon the idea that something may happen in the future, which will change the existing conditions. There can be no doubt that the debts owing to this petitioner by certain foreign subsidiary corporations were ascertained to be worthless and charged off its books in 1918 and that a loss on its investments in the capital stock of certain foreign subsidiary corporations was sustained within the year 1918.

*Judgment for the petitioner.*