**HALLIBURTON COMPANY, Plaintiff–Appellee,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Defendant– Appellant.**

No. 90–4739.

United States Court of Appeals, Fifth Circuit.

Nov. 4, 1991.

Charles Bricken, Gary R. Allen, Chief, Appellate Sec., Shirley D. Peterson, Richard Farber, Asst. Attys. Gen., Dept. of Justice, Tax Div., Washington, D.C., for petitioner-appellant.

David T. Harvin, Vinson & Elkins, Houston, Tex., for respondent-appellee.

Before POLITZ and HIGGINBOTHAM, Circuit Judges and KAZEN,* District Judge.

KAZEN, District Judge:

## OPINION

The Commissioner of Internal Revenue ("Commissioner") appeals from an adverse judgment by the Tax Court. *Halliburton Co. v. Commissioner*, 93 T.C. 758 (1989). The Commissioner raises two issues on appeal: (1) whether the Tax Court erroneously shifted the burden of proof from the taxpayer Halliburton Company ("Halliburton") to Commissioner, and (2) whether the Tax Court's conclusion that Halliburton had no reasonable prospect of recovering

* District Judge of the Southern District of Texas, sitting by designation.

its expropriation loss as of the end of 1979 was clearly erroneous. Finding no reversible error, we affirm.

## BACKGROUND

There is little, if any, dispute regarding the facts. Halliburton is an oilfield service company. In 1976 it invested $955,000.00 to purchase 25% of the stock of an Iranian barite mining venture which became known as "Doreen/IMCO." From 1977 through early 1979, Halliburton loaned Doreen/IMCO an additional $6,952,875.

In late 1978, Ayatollah Ruhollah Khomeini led an Islamic revolution in Iran, ousting Shah Mohammad Reza Pahlavi from power. As a result, many foreign interests in Iran were expropriated. Doreen/IMCO's facilities were expropriated in May 1979.

On November 4, 1979, Iranian militants seized hostages at the American embassy in Tehran. Ten days later, President Carter froze approximately $12 billion of Iranian assets in United States banks and their foreign branches. Many American businesses with claims against Iran subsequently filed lawsuits in United States courts and obtained pre-judgment attachments against approximately $2 billion of the frozen assets.

Halliburton did not follow this course, however, because no legal forum existed in any country in which it could have successfully pursued an expropriation claim against Iran. The Foreign Sovereign Immunities Act of 1976 and the "act of state" doctrine rendered Iran immune from any suit by Halliburton in the United States based on expropriation. *See generally* 28 U.S.C. §§ 1602–1611 (1982); Treaty of Amity, Economic Relations, and Consular Rights, June 16, 1957, U.S.–Iran, art. IV, para. 2, art. XI, para. 4, 8 U.S.T. 899; *Callejo v. Bancomer, S.A.,* 764 F.2d 1101 (5th Cir.1985) (discussing act of state doc-

trine and sovereign immunity). The parties agree that Halliburton could not realistically have pursued its claim in Iranian courts because of the hostilities between the United States and Iran.

By the end of 1979, Halliburton concluded that it had lost its investment in Doreen/IMCO. On its 1979 federal income tax return it deducted a long-term capital loss of $955,000 for its expropriated stock, and claimed an ordinary bad debt deduction of $6,913,116 for its expropriated loans, pursuant to section 165(a) of the Internal Revenue Code of 1954.[1]

On January 19, 1981, after months of fruitless negotiation, the United States and Iran reached a series of agreements known as the "Algiers Accords." The Accords, *inter alia,* provided for release of the hostages and created the Iran–United States Claims Tribunal for the purpose of hearing claims of American citizens against Iran. Iran took control of the frozen assets, from which approximately $5 billion were used to repay loans from United States banks. Approximately $1 billion were used to establish a security fund in order to pay awards of the Claims Tribunal.

On November 16, 1981, Halliburton filed a claim in the Claims Tribunal seeking to recover approximately $10 million in connection with its Doreen/IMCO losses. In 1984 Halliburton was awarded $2,955,000 in settlement of its claims. After deducting expenses incurred during the settlement, Halliburton reported this award on its 1984 federal income tax return.

Commissioner disallowed Halliburton's 1979 deduction of its Doreen/IMCO losses, asserting that Halliburton had a claim for reimbursement with respect to which there was a reasonable prospect of recovery as of the end of 1979, and therefore section 1.165–1(d)(2)(i) of the Treasury Regulations on Income Tax[2] barred deduction. Halli-

---

1. This section provides in pertinent part:
 § 165 *Losses.*
 (a) *General rule.* There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise.
 26 U.S.C. § 165(a) (1982).

2. This section provides in pertinent part:
 § 1.165–1. *Losses.*
 \* \* \* \* \* \*
 (d) *Year of deduction.*
 (1) A loss shall be allowed as a deduction under section 165(a) only for the taxable year in which the loss is sustained. For this pur-

burton filed suit, asserting that its expropriation losses were properly deductible in 1979.

The Tax Court found that even if Halliburton had a "claim for reimbursement" at the end of 1979,[3] it had no reasonable prospect of recovering on that claim and thus deduction in 1979 was proper. 93 T.C. at 781.

## ANALYSIS

### I. *The Burden of Proof*

 The taxpayer bears the burden of establishing that it had no reasonable prospect of recovery within the meaning of section 1.165–1(d)(2)(i). *Boehm v. Commissioner*, 326 U.S. 287, 293–94, 66 S.Ct. 120, 124, 90 L.Ed. 78 (1945) (citing *Burnet v. Houston*, 283 U.S. 223, 51 S.Ct. 413, 75 L.Ed. 991 (1931)); *Korn v. Commissioner*, 73,258 T.C.M. (P–H) 1173, 1176 (1973), *aff'd*, 524 F.2d 888, 890 (9th Cir.1975); *George M. Still, Inc. v. Commissioner*, 19 T.C. 1072, 1076 (1953). The Commissioner argues that despite the Tax Court's explicit acknowledgement that the burden of proof was on Halliburton and its ultimate finding that Halliburton met this burden, the Tax Court in fact imposed on the Commissioner the burden of negating any scenario in which Halliburton would have no means to recover its loss. In other words, the Commissioner contends that the Tax Court actually required him to prove that Halliburton had a reasonable prospect of recovering its loss, rather than requiring Halliburton to prove that it had no such prospect.

 Whether the Tax Court applied the proper legal standard in making its findings of fact is subject to review *de novo*. *Jacobson v. Commissioner*, 915 F.2d 832, 837 (2d Cir.1990) (citing *Sochin v. Commissioner*, 843 F.2d 351, 353 (9th Cir.), *cert. denied*, 488 U.S. 824, 109 S.Ct. 72, 102 L.Ed.2d 49 (1988)); *Bailey v. Commissioner*, 912 F.2d 44, 47 (2d Cir.1990); *American Realty Trust v. United States*, 498 F.2d 1194, 1198 (4th Cir.1974). We conclude that the Tax Court did not shift the burden of proof from Halliburton to the Commissioner.

The Tax Court opinion expressly recited that Halliburton had the burden of proof. The Commissioner selects several sentences from a thirty-seven page opinion as proof of erroneous burden-shifting. These sentences generally contained statements by the Tax Court rejecting various arguments by the Commissioner on the pivotal issue of whether Halliburton had a reasonable prospect of recovering its loss in 1979. The Tax Court explained that while certain scenarios presented some prospect of recovery, they did not present a reasonable prospect of recovery. The ultimate finding was that Halliburton "has carried its burden of proof that it suffered losses deductible in 1979 . . . ." 93 T.C. at 781. The Tax Court's lengthy opinion must be read in its entirety and not in "artificial isolation."

---

pose, a loss shall be treated as sustained during the taxable year in which the loss occurs as evidenced by closed and completed transactions and as fixed by identifiable events occurring in such taxable year.

\* \* \* \* \* \*

(2)(i) If a casualty or other event occurs which may result in a loss and, in the year of such casualty or event, there exists a claim for reimbursement with respect to which there is a reasonable prospect of recovery, no portion of the loss with respect to which reimbursement may be received is sustained, for purposes of section 165, until it can be ascertained with reasonable certainty whether or not such reimbursement will be received. Whether a reasonable prospect of recovery exists with respect to a claim for reimbursement of a loss is a question of fact to be determined upon an examination of all facts and circumstances. Whether or not such reimbursement will be received may be ascertained with reasonable certainty, for example, by a settlement of the claim, by an adjudication of the claim, or by an abandonment of the claim.

\* \* \* \* \* \*

26 C.F.R. § 1.165–1(d)(1), (2)(i) (1982).

**3.** The Tax Court found it unnecessary to decide whether a "claim for reimbursement" actually existed. *The Tax Court has previously held*, at the Commissioner's urging, that a claim must be based on a legal right to reimbursement and not "the possibility of a gratuitous reimbursement from a third party." *Colish v. Commissioner*, 48 T.C. 711, 717 (1967). In the instant case, the Commissioner took a contrary position and urged the Tax Court to revisit *Colish* and its progeny.

*See, e.g., United States v. Price,* 877 F.2d 334, 338 (5th Cir.1989) (regarding jury instructions).

## II. *Tax Court's Findings of Fact*

Whether Halliburton had a reasonable prospect of recovering its expropriation losses is a question of fact. 26 C.F.R. § 1.165–1(d)(2)(i); *see Boehm,* 326 U.S. at 294, 66 S.Ct. at 124 (whether corporate stock became worthless during particular year is "purely" question of fact); *Colish v. Commissioner,* 48 T.C. 711, 715 (1967) (appropriate time for deduction under section 165 is question of fact to be determined from surrounding circumstances); *accord Korn,* 524 F.2d at 890. The findings of the Tax Court may not be disturbed unless they are clearly erroneous. Fed. R.Civ.P. 52(a); *Commissioner v. Duberstein,* 363 U.S. 278, 291, 80 S.Ct. 1190, 1200, 4 L.Ed.2d 1218 (1960); *Korn,* 524 F.2d at 890 (citing *National Brass Works, Inc. v. Commissioner,* 205 F.2d 104, 107 (9th Cir.1953)); *Estate of Fuchs v. Commissioner,* 413 F.2d 503, 507 (2d Cir.1969). As the *Duberstein* court explained:

> "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 [(1948)]. The rule itself applies also to factual inferences from undisputed basic facts.... And Congress has in the most explicit terms attached the identical weight to the findings of the Tax Court.

*Duberstein,* 363 U.S. at 291, 80 S.Ct. at 1200 (citations omitted); *accord Boehm,* 326 U.S. at 293, 66 S.Ct. at 124; *Reeves v. B & S Welding, Inc.,* 897 F.2d 178, 180 (5th Cir.1990); *Lewis v. Timco, Inc.,* 736 F.2d 163, 166 n. 2 (5th Cir.1984) (citing *Pullman–Standard v. Swint,* 456 U.S. 273, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982)).

The clearly erroneous standard of review is a deferential one. " 'If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.' " *Amadeo v. Zant,* 486 U.S. 214, 226, 108 S.Ct. 1771, 1779, 100 L.Ed.2d 249 (1988) (quoting *Anderson v. Bessemer City,* 470 U.S. 564, 574, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985)); *accord Houston Oil & Minerals Corp. v. American International Tool Co.,* 827 F.2d 1049, 1055 (5th Cir.1987).

■ Under the plain language of section 1.165–1(d)(2)(i), the proper evaluation of whether Halliburton had a reasonable prospect of recovering its losses as of the end of 1979 is the "totality of the circumstances." The statute articulates no definitive legal test beyond this. *Boehm,* 326 U.S. at 292–93, 66 S.Ct. at 123–24 (quoting *Lucas v. American Code Co., Inc.,* 280 U.S. 445, 50 S.Ct. 202, 74 L.Ed. 538 (1930)). Rather, the standard for determining the year for deduction of a loss is a "flexible, practical ... realistic" one that varies according to the circumstances of each case. *Id.* 326 U.S. at 293, 66 S.Ct. at 124. The taxpayer's reasonable and honest belief as to when he sustained the loss is a factor in this determination, but it is not the sole or controlling one. *Id.* at 292, 66 S.Ct. at 123; *accord Korn,* 524 F.2d at 890; *Fuchs,* 413 F.2d at 507.

■ The Commissioner argues that events which occurred after December 31, 1979 are appropriately considered in determining whether Halliburton had a reasonable prospect of recovering its expropriation loss as of the end of 1979. Hindsight plays no role in the totality-of-the-circumstances analysis. The tax law does not require the taxpayer to be an "incorrigible optimist" about the possibility of some eventual recoupment before a loss is deductible. *United States v. S.S. White Dental Mfg. Co. of Penn.,* 274 U.S. 398, 403, 47 S.Ct. 598, 600, 71 L.Ed. 1120 (1927); *see George M. Still, Inc.* 19 T.C. at 1075 ("mere hope" of recovery not sufficient to deprive taxpayer of deduction). As the Second Circuit explained in *Fuchs:*

> At the time of the effective confiscation of petitioner's property in 1953 there was

no likelihood of recovery from the government of Czechoslovakia and no more than a possibility that some reimbursement would be effectuated by the United States government.... Nor is the fact that in 1962, nearly ten years after the seizure, she did receive a partial compensation award from the United States significant in evaluating her "claim for reimbursement" as of 1953.... In 1953 the prospect of recovery on that claim was far too "nebulous and problematical" ... to satisfy the requirement of the regulation.

*Fuchs,* 413 F.2d at 508 (citations omitted); *see Korn,* 73,257 T.C.M. (P–H) at 1178 (that taxpayer ultimately received award and compensation does not establish that he had reasonable prospect of reimbursement at time property expropriated).

▮ The Tax Court correctly recognized "that subsequent events should not be given determinative significance." 93 T.C. at 774 (citing *S.S. White Dental Mfg. Co.,* 274 U.S. at 403, 47 S.Ct. at 600). Rather, the existence of a reasonable prospect of recovery " 'must be determined from the facts and circumstances known or which reasonably could have been known at the end of the year' " in which the loss was deducted. *Id.* (quoting *Estate of Mann v. United States,* 731 F.2d 267, 278 (5th Cir. 1984)). Thus, the Tax Court correctly determined that the brightening prospect of recovery late in 1980 and the ultimate recovery by Halliburton of a portion of its loss as a result of the Algiers Accords in 1981 were not legally significant.

▮ Applying a "practical, realistic" totality-of-the-circumstances test, the Tax Court concluded that Halliburton had no reasonable prospect of recovering its losses as of the end of 1979. This conclusion was not clearly erroneous.

The Commissioner strenuously urges that the freeze gave Halliburton a reasonable prospect of recovery. Although the Carter Administration had publicly stated that the purpose of the freeze was to protect United States claimants, the Tax Court reasonably determined from the evidence

presented that the true purpose of the freeze was to serve as a bargaining chip for the release of the hostages. *See* 93 T.C. at 777 ("although the grounds for the freezing of Iran's assets had been articulated in economic terms, it is clear that the Carter Administration considered the welfare of the hostages a primary, and the protection of U.S. claimants of secondary, national concern.").

Precedent supports this conclusion. In the early 1950's, the Czechoslovakian government expropriated property belonging to American citizens. The Secretary of the Treasury then sold equipment targeted for exportation to Czechoslovakia and deposited the proceeds in a blocked bank account. The taxpayers were found to have no reasonable prospect of recovering their losses after the expropriation. *E.g., Estate of Fuchs v. Commissioner,* 68,188 T.C.M. (P–H) 1010, 1011 (1968), *aff'd,* 413 F.2d 503 (2d Cir.1969); Colish, *48 T.C. at 712–13;* accord Korn, *73,257 T.C.M. (P–H) at 1178.* As the Colish *court explained,*

> Unless there exists a claim based on a legal right for reimbursement from a third party in the year a loss occurs, the loss must be deducted in that year. The prospect of recovery must be based on firmer ground than the possibility of a gratuitous reimbursement from a third party.... "There was, undoubtedly, a moral obligation on the United States to pay the funds received ... to the individuals who had suffered losses at the hands of the enemy. There was, however, only a possibility of payment—an expectancy of interest in the fund, that is, a possibility coupled with an interest...." [P]etitioner had no existing right to reimbursement until 1958 when title IV of the International Claims Settlement Act of 1949 was passed; consequently, no claim for reimbursement existed at the time of nationalization.

*Colish,* 48 T.C. at 717 (quoting *Appeal of Remington Typewriter Co.,* 4 B.T.A. 880, 889 (1926)).

*Estate of Bary v. Commissioner,* 65,322 T.C.M. (P–H) 1959 (1965), *aff'd,* 368 F.2d 844 (2d Cir.1966), also supports this posi-

tion. The Soviet government had expropriated decedent's property in 1918 and 1919. The American government then seized Soviet assets in 1919, the rights to which the Soviet government ultimately assigned to the United States in 1933. Congress, however, did not make these assets available to satisfy expropriation claims of American citizens until 1955. The Tax Court determined that the full amount received in 1959 in satisfaction of decedent's expropriation claims constituted taxable income because the claim had no fair market value in 1940, at the time of decedent's death. 65,322 T.C.M. (P–H) at 1961. Rather, there existed at that time only a "moral obligation" on the part of the United States government to devote funds derived from the assigned assets to expropriation claims. *Id.* As such, the decedent in 1940 held only an "unenforceable inchoate right." *See id.* (noting that decedent could not have sued or filed claim against United States for any part of assets in 1940).

In the instant case, the Tax Court expressed "no doubt" as to the President's intention to protect United States claimants, but it was "satisfied that it did not rise to the level of a binding commitment." 93 T.C. at 778. The Court further found that the President retained "complete flexibility" with respect to the disposition of American claims, as well as plenary power to lift the freeze and void any attachments that might have been obtained without providing for United States claimants. *Id.* (citing *Dames & Moore v. Regan,* 453 U.S. 654, 669–75, 687, 101 S.Ct. 2972, 2981–84, 2990, 69 L.Ed.2d 918 (1981)). These findings are supported by the evidence and give credence to the Tax Court's conclusion that the freeze did not give Halliburton a reasonable prospect of recovery as of the end of 1979.

The Tax Court correctly considered numerous other factors in determining that Halliburton had no reasonable expectation of recovery. Halliburton had no legal forum in which it could have litigated its claims, nor could it have legally attached any of the frozen assets. The focus of diplomacy at the end of 1979 was on the hostages, not on the settlement of American claims. Negotiations between the United States and Iran were at a standstill. Iran certainly did not intend to reimburse American claimants for their losses at the time of the expropriation. As the Tax Court pointed out, "[n]ot until the fall of 1980, after a series of events occurred in 1980, including the Iranian clerical faction's assumption of power, the outbreak of the Iran–Iraq war, increased United States economic sanctions against Iran, the failed American rescue mission, the death of the Shah, and the impending change in the United States Administration, did Iran make overtures to settle the crisis." 93 T.C. at 780. Under these circumstances, the Tax Court could reasonably have determined that no reasonable prospect of recovery existed as of the end of 1979. Because this finding is not clearly erroneous, the judgment of the Tax Court is AFFIRMED.