**In re Terri L. STEFFEN, Debtor.**

**No. 01–09988–8P1.**

United States Bankruptcy Court,
M.D. Florida,
Tampa Division.

April 18, 2003.

Harley E. Riedel, II, Stichter, Riedel, Blain & Prosser, Tampa, FL, for debtor.

Mary Apostolakos Hervey, Washington, DC, for creditor.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND MEMORANDUM OPINION

ALEXANDER L. PASKAY, Chief Judge.

This is a yet to be confirmed Chapter 11 case of Terri L. Steffen (Debtor). In the

Debtor's Chapter 11 case, the United States of America (Government) filed a proof of claim, Claim No. 6, in the total amount of $5,856,721.11.[1] (Claim No. 6/Db. Ex. 1). The Claim by the Government is based on adjustments following an examination of the Debtor's joint tax returns, together with her spouse, Paul A. Bilzerian (Bilzerian), for the years 1985, 1986, 1991, 1992, and 1993. On February 6, 2002, the Debtor filed "Objection to Claim filed by the Internal Revenue Service" (Doc. No. 40), where she stated that she was not indebted to the Internal Revenue Service (IRS), or at least not in the amounts claimed. She also contended that there was: (1) the disallowance of a deduction by the Debtor and Bilzerian of loss of value of their stocks, which according to them became worthless in the year 1989 and (2) an erroneous determination that the Debtor understated her capital gain from the disposition of South Bay Fashion Center (South Bay) during the year 1992. This Objection was originally an objection to Claim No. 3, and by Order of this Court (Doc. No. 80), the Objection stood over to the amended claim of the Government, Claim No. 6. On March 14, 2002, the Debtor filed "Pretrial Memorandum for Preliminary Hearing" (Doc. No. 54), which outlined eleven additional specific objections to Claim No. 6, which the parties agreed would be treated as an "amended objection."

Prior to the scheduled final evidentiary hearing, the parties agreed that the issues would be bifurcated and the first two issues should be tried first. Accordingly, the two issues, which were scheduled for final evidentiary hearing, are the following:

(1) Whether the Debtor is entitled to claim a loss of the value of the stock

---

1. Claim No. 6 amends Claim No. 3 of the Internal Revenue Service. Claim No. 6 is essentially identical to Claim No. 3 except

that the IRS asserted that its claim was "secured by any claims Debtor may have against the U.S."

in excess of $23,366.705 in Bicoastal Corporation (Bicoastal).

 (a) How much did the Debtor and Bilzerian invest in Bicoastal?

 (b) What year did their investment become worthless?

(2) What is the basis of the Debtor's and Bilzerian's interest in South Bay for purposes of determining the amount of any capital gain realized upon foreclosure of the property in 1992.

At the trial, this Court heard testimony of witnesses considered the documents offered and introduced into evidence, and now makes the following findings of fact and conclusions of law.

### Brief Background of Facts

In 1987, Bilzerian formed Bilzerian Partners Limited Partnership–1 (BPLP–1), a Florida limited partnership. At that time, Singer Company[2] (Singer) was a publicly traded company. During 1987, BPLP–1, through Bilzerian and Bicoastal Acquisition Corporation (Bicoastal Acquisition), began to acquire shares of Singer in the open market, and ultimately acquired approximately two million shares at a cost of approximately $87 million. Following these purchases, BPLP–1 made a formal tender offer to purchase the remaining common stock of Singer for $50 per share. BPLP–1 was comprised of two general partners: Bilzerian and Bicoastal Acquisition, as well as five limited partners. According to the testimony of Bilzerian, the Debtor and Bilzerian directly or indirectly owned approximately 30.6% of BPLP–1.

The leveraged buyout was financed by a consortium of banks, Shearson, Lehman Brothers Holdings, Inc. (Shearson), and Mesa Holding Limited Partnership (Mesa). Both Shearson and Mesa received stock of Singer (Shearson received Class B common stock and Mesa received both Junior Preferred and Class C common stock). At the end of the leveraged buyout (in the year 1987), the equity structure of Singer was as follows: $3.50 Senior Preferred (publicly held); Junior Preferred (Mesa); Class A common (BPLP–1); Class B common (Shearson); and Class C common (Mesa).

During the relevant times, Singer created Link Flight Simulation Corporation (Link Fight) as its wholly owned subsidiary. Link Flight was the successor-in-interest to the Singer–Link Flight Simulation Division of Singer. Link Flight was in the defense contract business, providing electronics and training systems to the Government pursuant to several large defense contracts with the Government. Link Flight was involved in providing products that supported certain military aircraft programs including the Cobra, Apache, and Blackhawk helicopters; F–16 fighters; B–52 bombers; and other aircrafts.

Following the leveraged buyout, in or around September of 1988, Singer exercised its right to trigger the valuation of the stock of Bicoastal between BPLP–1, Mesa and Shearson. Ultimately, in 1989, Singer now called Bicoastal, as a result of the name change, purchased the remaining stock of Mesa and Shearson and issued promissory notes to them for the purchase prices of their Class B and Class C common stock.

In the year 1989, the Government brought a complaint against Bicoastal and its subsidiaries under the False Claims Act, and sought damages in the amount of $231 million, together with civil penalties. In this action, the Government claimed that Bicoastal engaged in a scheme to defraud the Government in that the defen-

---

2. In 1989, Singer changed its name to Bicoastal.

dants falsely represented cost estimates (Urda litigation). (Db.Ex. 9). Several other lawsuits ensued and ultimately, as described below, Bicoastal filed for Chapter 11 protection under the Bankruptcy Code. This was the beginning of the business demise of Bicoastal.

### Determination of Year that Debtor Can Claim Worthless Stock Deduction

#### a. Summary of Each Parties' Position

Bilzerian and the Debtor (together, Taxpayers), as noted earlier, are husband and wife. They filed joint income tax returns, as amended for the years at issue: 1985, 1986, 1991, 1992, and 1993. (Db. Exs. 26, 27, 30, 31, 32, 33, 34, 35 and IRS Exs. 12–18). On or about June 20, 1991, the Taxpayers filed an amended income tax return for the year 1989. (Db.Ex. 30). In the amended return, the Taxpayers asserted that their investment in Bicoastal had become worthless in the year 1989, resulting in a loss of $23,366.705. Accordingly, the Debtor asserts that she is entitled to claim a capital loss from the worthlessness of her Bicoastal stock in the tax year 1989, and in the amount of $23,366.705.

In support of this proposition, the Taxpayers identified several events in the year 1989, which they claim demonstrate that the stock in Bicoastal had no realistic prospect of value and that Bicoastal was insolvent. Through the testimony of David L. Redmond, the former CFO and President of Bicoastal, as well as a member of its Board of Directors, the Taxpayers identified at least eight adverse events, which in their opinion, demonstrate that the common stock of Bicoastal became worthless in 1989. These events include the following: (1) arbitration of a claim of General Instrument Corporation for damages in the amount of $34 million; (2) filing of an action by CAE for damages in excess of $100 million; (3) granting by a Connecticut court of class certification in certain retir-

ee benefit litigation; (4) filing of an action by HSSM seeking $42 million; (5) filing of an action by Bankers Trust of suit to compel Bicoastal to post additional collateral; (6) "delivery" to Bicoastal of a claim by the Defense Logistics Agency for more than $100 million; (7) entry of injunction in the Urda litigation, which prohibited Bicoastal from making payments to Mesa and Shearson, which then caused a default in Bicoastal's obligation to Mesa and Shearson; and (8) filing of a Voluntary Petition seeking Chapter 11 relief on November 11, 1989.

In opposition, the Government asserts that the Debtor can only claim a loss in the year in which the loss is sustained and the loss was not sustained until the tax year 1993, when the litigation involving Bicoastal and Semi–Tech MicroElectronics (Far East), Ltd. (Semi–Tech) was finally resolved. In these regards, the Government asserts that Bilzerian, himself, estimated that the royalty agreement at issue was valued at $500 million, an amount that would have been more than sufficient to allow for a distribution to not only all creditors but also to the holders of the common stock. Moreover, during the Chapter 11 case, Bicoastal continued to operate and Bilzerian acted in a manner, which supported his contention that the Semi–Tech litigation would result in a distribution to shareholders. Therefore, according to the Government, the stock did not become worthless until the year 1993, when this Court approved the compromise of the Semi–Tech litigation for $94 million, or significantly less than the estimated $500 million. These are the facts relevant to the first issue, i.e., the year to claim the loss of value of the Bicoastal stock.

#### b. Legal Analysis and Findings

 It is well established that the taxpayer bears the burden of proving the

right to and the amount of any claimed deduction. *New Colonial Ice v. Helvering,* 292 U.S. 435, 54 S.Ct. 788, 78 L.Ed. 1348 (1934). Because the taxpayer is the person who holds the information and is required to produce it, the burden of proof never shifts to the United States. *INDOPCO, Inc. v. Commissioner,* 503 U.S. 79, 84, 112 S.Ct. 1039, 117 L.Ed.2d 226 (1992). A deficiency determination issued by the Government is presumptively correct. *Welch v. Helvering,* 290 U.S. 111, 54 S.Ct. 8, 78 L.Ed. 212 (1933).

■ Section 165(g) of the Internal Revenue Code (IRC) authorizes a deduction for a loss from a worthless security, including stock in a corporation. 26 U.S.C. § 165(g)(2)(A). A taxpayer may deduct a Section 165(g) loss "only for the taxable year in which the loss is sustained." Treas. Reg. § 1.165–1(d)(1). The Supreme Court has ruled that "the question of whether a particular corporate stock did or did not become worthless during a given taxable year is purely a question of fact" to be determined by the court. *Boehm v. Commissioner,* 326 U.S. 287, 293, 66 S.Ct. 120, 90 L.Ed. 78 (1945). *See Delk v. Commissioner,* 113 F.3d 984 (9th Cir.1997); *Favia v. Commissioner,* T.C.M. 2002–154, 2002 WL 1332810 (U.S.Tax Ct.)(2002).

■ In order to support a deduction, the claimed loss must be evidenced by "closed and completed transactions" and fixed by "identifiable events," all of which actually occurred during the taxable year. Treas. Reg. § 1.165–1(b). The former Board of Tax Appeals formulated a two-prong test for determining whether a security has become worthless. First, the stock must have no current liquidating value; and second, it must have no potential future value. *Sterling Morton v. Commissioner,* 38 B.T.A. 1270, 1278–1279, 1938 WL 165 (1938), *aff'd,* 112 F.2d 320

(7th Cir.1940). The taxpayer must demonstrate this loss of value by a preponderance of the evidence. *Id. See Cole v. Commissioner,* 871 F.2d 64 (7th Cir.1989); *Estate of Mann,* 731 F.2d 267 (5th Cir. 1984).

■ As long as the stock has any value whatsoever, either present or potential, a taxpayer may not claim a deduction. *Miami Beach Bay Shore v. Commissioner,* 136 F.2d 408, 409 (5th Cir.1943). A corporate stock is not worthless until the last vestige of value has disappeared. However, a "mere hope," or a "remote hope" that there may be some recovery will not preclude its deduction as worthless. *Halliburton Co. v. Commissioner,* 946 F.2d 395 (5th Cir.1991); *United States v. S.S. White Dental Mfg. Co.,* 274 U.S. 398, 399–400, 47 S.Ct. 598, 71 L.Ed. 1120 (1927). A mere shrinkage in the value of stock owned by the taxpayer, even though extensive, does not give rise to a deduction under Section 165 if the stock has any recognizable value on the date claimed as the date of loss. Treas. Reg. § 1.165–4(a).

■ An "identifiable event" includes such decisions as to liquidate or terminate a business to sustain a worthless stock deduction. *Genecov v. United States,* 412 F.2d 556 (5th Cir.1969); *Gowen v. Commissioner,* 65 F.2d 923 (6th Cir.1933). However, the mere fact that a company has filed bankruptcy, became insolvent, or was placed in receivership is not enough to establish a total loss of the value of the stock. *Genecov, supra; Brimberry v. Commissioner,* 588 F.2d 975 (5th Cir. 1979). *But see Steadman v. Commissioner,* 50 T.C. 369, 376–77, 1968 WL 1558 (1968), *aff'd,* 424 F.2d 1 (6th Cir.), *cert. denied,* 400 U.S. 869, 91 S.Ct. 103, 27 L.Ed.2d 109 (1970) (holding that identifiable events include bankruptcy filing, ces-

sation of business, and liquidation of corporation).

■ Based on this record, this Court is satisfied that the taxpayer must to establish by a preponderance of the evidence that the two-prong test was met to claim the worthlessness of the stock of Bicoastal in the year 1989. Specifically that there is no current liquidating value *and* that there is no potential future value in a given year for the claimed worthlessness (emphasis supplied). This Court is equally satisfied that the record supports the finding that the only issue in this case is whether or not there was "potential future value" in the stock of Bicoastal and that the Debtor has satisfied the first prong.

There are a number of ways in which a taxpayer may demonstrate that the stock has no potential value. First, the taxpayer may provide the Court with "identifiable events," such as the conclusion of a lawsuit, where the taxpayer prevailed but the defendant is judgment proof and the judgment cannot be collected. Next, the taxpayer can provide the Court with events such as the entry of adverse judgments from courts of competent jurisdictions. Finally, regardless of any recovery of a lawsuit in favor of the taxpayer, the taxpayer can establish that there is a total loss of the potential value of the stock because the liabilities of a corporation so greatly exceed its assets that there is no "reasonable hope" or expectation that the business will continue in order to result in any recovery to its stockholders.

In the case at hand, the Debtor principally relies on certain identifiable events that occurred in the year 1989, as the evidence that the stock of Bicoastal became worthless in that year. Upon review and analysis of the adverse events relied on by the Taxpayers, this Court is satisfied that not all of the events were "closed and completed transactions . . . all actually sus-

tained during the taxable year," as set forth in Treas. Reg. § 1.165–1(b). In the Urda litigation, the district court entered an injunction precluding Bicoastal from disposing of assets out of the ordinary course of its business; prohibiting Bicoastal from paying dividends or other amounts to shareholders; and enjoining Bicoastal from making any debt payments to Mesa and Shearson. (Db.Ex. 10).

The Debtor heavily relies on this Memorandum Opinion as support that Bicoastal's liabilities "far exceeded" its assets, that Bicoastal was insolvent, and that there was not even remote hope that the shareholders of Bicoastal would receive any distribution on their stock. However, the district court also pointed out that the injunction merely precluded Bicoastal from disposing of its assets at that time because unless the injunction was granted, the Government would be irreparably injured. Moreover, the district court, in response to Bicoastal's assertions that the injunction was detrimental to its business, aptly stated that "the assets [of Bicoastal] will still be available for sale to another purchaser, if Singer remains solvent at the conclusion of this litigation." (Db.Ex. 10, p. 9–10).

The other adverse events relied on by the Taxpayers were the number of lawsuits *filed* against Bicoastal. However, at the time relevant, none of these had been adversely resolved with finality against Bicoastal. This Court is satisfied that the mere filing of a lawsuit is not a "closed and complete transaction." Although Redmond testified that the cumulative effect of these suits were in excess of $500 million, these were only claims which may or may not be ultimately recognized. It is a well-known fact that plaintiffs generally seek greater recoveries than what is actually awarded. Moreover, the filing of the Chapter 11 by Bicoastal stayed the continuation of the civil suits against Bicoastal

and the claims asserted against the debtor would have had to be resolved in the bankruptcy court without intervention of a jury. It is common knowledge that jurors are generally more generous than awards made by the bench in cases tried without a jury.

The Taxpayers also rely on the fact that this Court entered an Order in the bankruptcy case of Bicoastal on November 21, 1989, which initially denied Mesa's request to designate a majority of the Board of Directors. (Db.Ex. 15). This Court put Bicoastal on such a short string that it ultimately became impossible for Bicoastal to achieve reorganization. In addition, the Debtor relies on this Court's Order of December 11, 1989, where this Court initially denied a motion to dismiss the bankruptcy case of Bicoastal, filed by CAE Industries, Ltd., one of Bicoastal's largest creditors. As indicated, this Court denied both the initial requests of Mesa and CAE. This Court is satisfied that the entry of these orders were not an adjudication that Bicoastal was insolvent but merely held as a matter of law, that Bicoastal was entitled to attempt to reorganize or liquidate its assets under Chapter 11. The entry of the Orders were not identifiable events demonstrating that Bicoastal stock had no present or potential value, or that it had insufficient assets to satisfy, at least in part, equity interests. Moreover, although this Court made reference to Bicoastal's "dire financial condition," there was no adjudication that Bicoastal stock had no potential future value, after all, the Semi–Tech litigation was not yet concluded.

In opposition to the "identifiable events," the Government advances its case that the Semi–Tech lawsuit, in which Bilzerian himself testified was worth $500 million, was not "completed" until the year 1993, when this Court approved the compromise of the claim of Bicoastal against Semi–Tech. Therefore, there was potential value for the Bicoastal stock until that year. Moreover, the Government asserts that certain acts of the Taxpayers, as more fully described below, supports of the Government's position that the Bicoastal stock did not become worthless until the year 1993.

The record demonstrates that after 1990, the Taxpayers did in fact act in a manner that supports the Government's position. First, in 1990, Bilzerian transferred three separate "partial interests" in Bicoastal Limited Partnership (BLP), which owned 25% of BPLP–1, whose assets was the common stock of Bicoastal, in full satisfaction of certain debts owed by Bilzerian to John T. Roth, Trustee, James L. Forgason, and Forgason, Inc. in the approximate amount of $7.5 million. (IRS Exs. 34, 35, and 36). Second, in June of 1991, Bilzerian borrowed approximately 13 million dollars from John Oxley, granting as collateral for the loan a first priority security interest in Bicoastal Financials' the interest of BLP. (IRS Ex. 44). Third, Bilzerian represented to the Chapter 7 Trustee, during his own Chapter 7 bankruptcy case, that BPLP–1 had significant value. (IRS Ex. 45). Fourth, in 1993 and prior to the resolution of the Semi–Tech litigation, the Taxpayers entered into a settlement agreement with Bilzerian's Chapter 7 Trustee and agreed to transfer 25% interest in BPLP–1 to the Trustee. (IRS Ex. 40). It is true, however, that this agreement never came to fruition. Fifth, both Bilzerian and James Orr, the trustee, objected to the settlement with Semi–Tech (IRS Exs. 37 and 38), stating that the proceeds from the Semi–Tech litigation were the only assets of Bicoastal and that the proposed settlement amount was substantially less than the actual value of the future royalties yet to be earned by Semi–Tech using Singer's name. Finally, the Debtor, as president of Loving Spirit

Foundation, reported on Loving Spirit's 1993 tax return an interest in BPLP–1 as an asset in the amount of $595,830. (IRS Ex. 55).

In opposition, the Debtor points to the testimony of Bilzerian, where he stated that he did not believe that the stock in Bicoastal had any value or else he would not have signed the 1989 amended tax return in the year 1991. In the same testimony, however, Bilzerian failed to re-call specific events and amounts when cross-examined by the Government's coun-sel. This Court is satisfied that the actual acts of the Taxpayers from 1989 through 1993, as evidenced by the Government's exhibits, cannot be discounted by either of their testimonies some ten years later. Although the Taxpayers argue that the mental state or subjective opinions of the Taxpayers are not controlling, citing *Boehm, supra,* this Court is satisfied that in this instance, one could assume that there was potential value in the common stock of Bicoastal by the conduct of the Taxpayers. Moreover, in or around Octo-ber of 1994, Bilzerian himself discussed the worthlessness issue with one of the Gov-ernment's agent, stating that the stock became worthless in *either* the year 1989, when Bicoastal filed for Chapter 11 relief or 1993, when the Semi–Tech litigation concluded. (Transcript, p. 271, lines 12–15).

Based upon the foregoing legal princi-ples and the facts as adduced at trial, this Court is satisfied that the Taxpayers failed to establish by the requisite degree of proof that the two-prong test was satisfied for the claim of a total loss of value of the stock of Bicoastal in the year 1989. This Court is satisfied that the cumulative events in the year 1989 did not leave Bi-coastal stock without any potential value. Bicoastal was no doubt in dire financial conditions, but it is without dispute that its

claimed asset in the Semi–Tech litigation, together with a possible reorganization, could have resulted in some value and distribution to the holders of the common shares of Bicoastal. This Court is satisfied that the Taxpayers cannot claim the worthless stock loss deduction until the year 1993.

### Determination of Debtor's Adjusted Basis in Bicoastal Stock

#### a. Summary of Parties' Position

The Debtor claims that she is entitled to an adjusted basis in Bicoastal stock of $23,366,705, as set forth on the Taxpayers' tax return for the year 1989. At the trial, the Debtor claimed that her initial invest-ment in Bicoastal exceeded $30,000,000; however, this was reduced after Peat Mar-wick determined that approximately $7,000,000 had been "borrowed monies." The Taxpayers contend that their invest-ment in BPLP–1 is 30.60%, which equates to $23,366,705. In support of this asser-tion, the Debtor relies on the testimony of Bilzerian and Redmond, a number of checks and bank statements. (Db.Ex. 8).

The Government, on the other hand, argues that the Taxpayers have presented no competent evidence that they are enti-tled to any basis in Bicoastal stock. The Government bases its argument on its as-sertion that the evidence submitted at trial was not competent, that the Taxpayers had no income in the prior years sufficient to support a $30 million dollar investment in Bicoastal or BPLP–1 of their own mon-ey, and that the Taxpayers have no rec-ords, books of accounts, or other docu-ments to support their adjusted basis of $23 million. In the alternative, the Gov-ernment asserts that if this Court sustains the $23 million adjusted basis, this amount must be further reduced as a result of several loans, from Oxley, Forgason, For-gason, Inc. and Roth, as well as a reduc-tion as a result of Bicoastal Holding Com-

pany's 1.6 million dollar write-off as bad debt. According to the Government, there should be a reduction of at least $18.6 million, resulting in an adjusted basis of approximately $4.4 million.

### b. *Legal Analysis and Findings*

 Section 165(b) of the IRC provides that the "basis for determining the amount of the deduction for any loss shall be the adjusted basis provided in section 1011 for determining the loss from the sale or other disposition of property." 26 U.S.C. § 165(b). Section 1011 of the IRC provides that "the adjusted basis for determining the gain or loss from the sale or other disposition of property, whenever acquired, shall be the basis (determined under section 1012 or other applicable sections of this subchapter...." Finally, Section 1012 of the IRC provides that the basis of property shall be the cost of such property, except as otherwise provided in this subchapter and subchapters...." Therefore, the taxpayer must substantiate the cost of such property; in this case, the Debtor must demonstrate how much she invested in BPLP–1, and in turn indirectly in Bicoastal, in order to claim the worthless stock loss deduction.

At the trial, both the Debtor and the Government disagreed as to the initial cost basis in the Bicoastal stock. This Court is satisfied that neither arguments asserted are persuasive and that the Government, through the testimony of Mr. O'Neill, the revenue agent, never questioned the $23,366,705 cost basis figure from the beginning of their investigation of the Taxpayers, as far back as 1993, and therefore, the initial cost basis should be the amount of $23,366,705.

This leaves for consideration whether or not there should be any additional reductions to the initial basis as a result of the various loans made to Bilzerian and his related entities, pursuant to 26 U.S.C. § 108(b)(2), as a result of debt forgiveness. In these regards, the Government argues that the Taxpayers had insufficient assets to have been able to fund the purchase of $23 million for the Bicoastal stock. (IRS Ex. 60). Therefore, these loans must have been for the purchase of the stock. Also, during the relevant period, the Taxpayers were in the process of building their home, valued in excess of $6 million, and bought other real estate throughout the United States. Thus, the Government contends that the facts do not support the proposition that the Taxpayers had hard assets, which they could have liquidated to generate funds for both their real estate purchases and stock acquisition.

In opposition, the Debtor states that the Government failed to substantiate that any of the loans were for the purchase of the stock, that Bilzerian stated that the same were not necessarily for the purchase of the stock, that the basis should not be reduced at all, or if so, the original starting point for the basis should be $30 million, with the appropriate reductions.

This Court has considered the record, as well as the testimony of the witnesses, and concludes that the $23 million basis must be reduced by the loans described above. This Court is satisfied that the record supports the conclusion that the Taxpayers had insufficient hard assets to which they could have liquidated over a period of time, in order to raise $23 million to buy the stock, or as the Debtor claims, $30 million. Moreover, Bilzerian, although he was somewhat unclear, ultimately conceded that the monies loaned to him were for the purchase of the stock. Also, the Government's witness stated that the basis must be reduced pursuant to Sections 108 and 1017 of the IRC and then discussed the various loans based upon his audit and conversations with the Taxpayers. Ac-

cordingly, this Court is satisfied that the $23 million basis must be reduced by $18.6 million ($7.4 million from Forgason, his related entities, and Roth; $9.5 million from Oxley; and $1.6 million from Bicoastal Holding Company). Therefore, the adjusted basis in the Bicoastal stock is $4,766,705.

### Determination of the Capital Gain from the South Bay Fashion Center Foreclosure Action

■ The last issue presented at trial was a request for a determination of the basis of the Taxpayers' interest in South Bay for purposes of determining the amount of any capital gain realized by the Taxpayers upon foreclosure of the property in the year 1992. In these regards, the Debtor conceded that she is subject to capital gain income resulting from the foreclosure of the Debtor's interest in South Bay, a shopping center. (IRS Exs. 22–27). Pursuant to applicable law, the gain is the difference between the amount of the debt and the taxpayer's basis in the property. *Commissioner v. Tufts,* 461 U.S. 300, 103 S.Ct. 1826, 75 L.Ed.2d 863 (1983); Treas. Reg. § 1.1001–2.

It is undisputed that the amount of debt forgiven is $5,420,160.31, as evidenced by the Final Judgment rendered in the state court foreclosure action. (IRS Ex. 25). In the Final Judgment, the state court judge rendered a judgment in the amount of $5,969,438.94; however, this figure included interest and other costs. Accordingly, both parties agree that the debt forgiveness is the principal amount, which is $5,420,160.31.

■ The only dispute centers around the basis in the subject property. The Government agrees with the Debtor's counsel's initial calculation of the basis at $2,416,075; however, the Government asserts that additional adjustments must be made. (IRS Ex. 74). These adjustments

include a reduction of $19,130 for rental income from some tenants (IRS Ex. 73), and two additional reductions from a $250,000 deposit and certain depreciation in 1990 of $309,680.

The Debtor asserts, in opposition, that the Government's calculation of basis contains several errors: first, there was no increase in the Debtor's basis by $600,000, as a result of the Debtor's purchase of David Tallant's interest in the strip center; second, there was an improper reduction in basis regarding a $250,000 deposit; and third, there was an improper reduction for alleged rental income. The Debtor supports her calculation of the basis through Bilzerian's testimony. (Db.Ex. 36).

Based upon the testimony at trial and the exhibits introduced regarding the South Bay issue, this Court is satisfied that the starting point for basis in the subject property should begin with the agreed upon amount of $2,416,075. This Court is equally satisfied that both parties agreed to the following amounts as an addition to the basis: $22,500, purchase from Grusky; $200,000, purchase from Southbay One; and $736,141, passive activity suspended losses, for a total addition of $958,641. Concerning the proposed reductions to the basis, this Court is satisfied that the basis should be reduced by $19,130, for the additional rental income realized by Bilzerian and by $309,680, for the 1990 depreciation. Bilzerian, in this testimony, indicated that the 1990 depreciation was taken on his tax returns; therefore, it is without dispute that this amount is a proper reduction. Equally, however, this Court is satisfied that none of the additional reductions are warranted and neither is the $600,000 increase as urged by the Debtor. Accordingly, this Court is satisfied that the result of the additions and reductions to the basis, the basis in

the property is $3,045,906 and therefore, the gain is $2,374,254.31.

Accordingly, it is

ORDERED, ADJUDGED AND DE-CREED that the parties shall submit a joint statement based upon the foregoing, calculating the precise amount of the Government's allowable claim.